**William Karl SCHMIDT**

v.

**Elizabeth M. DEGEN, Individually and in her capacity as District Justice of the Peace of Kitnersville, Pennsylvania, et al.**

**Civ. A. No. 74–828.**

United States District Court,
E. D. Pennsylvania.

June 6, 1974.

Leo R. Zamparelli, Weiss, Nelson & Moskowitz, Cornwells Heights, Pa., for plaintiff.

Lawrence J. Roberts, Philadelphia, Pa., for defendant Degen.

## OPINION

LUONGO, District Judge.

This is a suit alleging violation of civil rights under 42 U.S.C. §§ 1981, 1983.[1] The defendants are Elizabeth M. Degen, a District Justice of the Peace in Kintnersville, Pennsylvania; James Taylor, Police Sergeant, Tinicum Township; George Derr, Chief of Police, Tinicum Township; and Tinicum Township. Before the court is the motion of District Justice Degen to dismiss the action as to her for failure to state a claim on which relief can be granted. F.R.Civ.P. 12(b)(6).

On a motion to dismiss, the allegations of plaintiff's complaint must be taken as true. Frederick Hart & Company v. Recordgraph, 169 F.2d 580 (3d Cir. 1948); Melo-Sonics Corp. v. Cropp, 342 F.2d 856 (3d Cir. 1965). Accordingly, the complaint establishes that while driving through Tinicum on July 6, 1973, plaintiff, William Karl Schmidt, was stopped by a policeman and arrested on various charges of disorderly practices and causing a disturbance on the property of one John Hulbard. The charges included acting in a disorderly manner; discarding beer bottles, cans or other debris; congregating unlawfully with others; failing to comply with the lawful order of the Tinicum Township police; marring or destroying a "no trespassing" sign by burning it; and conspiring with others to perform these acts.

Schmidt was tried on these offenses before defendant Degen on September 21, 1973. At that time only two witnesses testified against him, defendant Taylor and John Hulbard, the owner of the property at which the alleged offenses occurred. Taylor admitted that he had not arrested Schmidt and that he had no knowledge of Schmidt's supposed involvement in the disturbances beyond the fact that Schmidt's name appeared on a list of individuals allegedly at the

---

1. 42 U.S.C. § 1981 provides:

"All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

42 U.S.C. § 1983 provides:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to

the party injured in an action at law, suit in equity, or other proper proceeding for redress."

Section 1981, like its historical companion 42 U.S.C. § 1982, "was designed to do just what its terms suggest: to prohibit all racial discrimination, whether or not under color of law, with respect to the rights enumerated therein . . . ." Jones v. Al-S.Ct. 2186, 2201, 20 L.Ed.2d 1189 (1968); Tillman v. Wheaton-Haven Recreation Ass'n, 410 U.S. 431, 439–440, 93 S.Ct. 1090, 35 L.Ed. 2d 403 (1973). Plaintiff has not alleged that defendants' actions were racially motivated; he has therefore failed to state a claim under § 1981. However, § 1983 provides an adequate statutory basis for plaintiff's claims, securing as it does all federally-protected rights against violation by persons acting "under color" of state law.

scene of the disturbance. Taylor also had no knowledge as to how the list of suspects was compiled and how Schmidt's name came to be on it, although he believed that some of the names were taken from driver's licenses of people found in the vicinity of the disturbance. Hulbard testified that there was substantial disorder at his property, but stated that he did not see Schmidt on the premises. On this testimony, Degen found Schmidt guilty of the charged offenses and imposed a $50 fine plus $11 in court costs. Schmidt filed an appeal from that ruling, whereupon the charges against him were dropped.

Schmidt charges that the guilty verdict rendered by Degen was arbitrary and unreasonable because there was no evidence to support it and violated his constitutional rights to due process and to confront his accusers. He alleges that he suffered great anguish, humiliation, derision and scorn as a result of the conviction, and was required to expend considerable time and effort to appeal Degen's decision. He seeks $25,000 in compensatory damages and $25,000 in punitive damages from defendants and asks that all records in the possession of Tinicum Township pertaining to his arrest and detention be expunged.

District Justice Degen argues that the doctrine of judicial immunity insulates her from suits for damages arising out of the conduct of her judicial responsibilities, and therefore the action should be dismissed as to her. I agree and the motion to dismiss will be granted on that ground.

Historically, "[f]ew doctrines were more solidly established at common law than the immunity of judges from liability for damages for acts committed within their judicial jurisdiction . . . ." Pierson v. Ray, 386 U.S. 547, 553–554, 87 S.Ct. 1213, 1217, 18 L. Ed.2d 288 (1967). It can "be found in the earliest judicial records, and it has been steadily maintained by an undisturbed current of decision in the English courts, amidst every change of policy, and through every revolution of their

government." Bauers v. Heisel, 361 F. 2d 581, 587 (3d Cir. 1966), cert. denied, 386 U.S. 1021, 87 S.Ct. 1367, 18 L.Ed.2d 457 (1967), quoting from Yates v. Lansing, 5 Johns (N.Y.) 282, 291 (Sup.Ct. of Judicature 1810).

Here in the United States, the Supreme Court recognized the doctrine's historic importance and the policy reasons necessitating its retention in Bradley v. Fisher, 80 U.S. (13 Wall.) 335, 20 L.Ed. 646 (1871). In that case, the court wrote:

" . . . it is a general principle of the highest importance to the proper administration of justice that a judicial officer, in exercising the authority vested in him, shall be free to act upon his own convictions, without apprehension of personal consequences to himself. Liability to answer to every one who might feel himself aggrieved by the action of the judge, would be inconsistent with the possession of this freedom, and would destroy that independence without which no judiciary can be either respectable or useful." 80 U.S. at 347.

The court continued in *Bradley* to define the scope of judicial immunity:

" . . . judges of courts of superior or general jurisdiction are not liable to civil actions for their judicial acts, even when such acts are in excess of their jurisdiction, and are alleged to have been done maliciously or corruptly. A distinction must be here observed between excess of jurisdiction and the clear absence of all jurisdiction over the subject-matter. Where there is clearly no jurisdiction over the subject-matter any authority exercised is a usurped authority, and for the exercise of such authority, when the want of jurisdiction is known to the judge, no excuse is permissible. * * *" 80 U.S. at 351–352.

It was at one time arguable that Congress intended, by the enactment of § 1983, to abolish common law judicial immunity and subject judges to suits for damages for deprivations of civil rights.

The Congress which enacted that statute had before it evidence that members of the judiciary were implicated in the systematic denial of civil rights which the statute was intended to remedy. The legislative history also affords some basis for concluding that Congress envisioned § 1983 as exposing judges to civil liability. Pierson v. Ray, 386 U.S. 547, 559–562, 87 S.Ct. 1213, 18 L.Ed.2d 288 (dissenting opinion of Douglas). Indeed, the Third Circuit ruled in Picking v. Pennsylvania R. Co., 151 F.2d 240, 250 (3d Cir. 1945) that § 1983 was intended to abolish judicial immunity "to the extent indicated by that act and in fact did so . . . . "

More recently, however, that contention has been totally discredited. In Tenney v. Brandhove, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951), the Supreme Court carved out an exception in § 1983 to accommodate the common law doctrine of *legislative* immunity, holding that state legislators were immune from suit as long as the deprivation of civil rights alleged occurred while they "were acting in a field where legislators traditionally have power to act." 341 U.S. at 379. *Tenney* did not address the question of *judicial* immunity, but its relevance was obvious. The Third Circuit reversed the position taken in *Picking* and held that the common law judicial immunity defined by *Bradley* remained intact despite § 1983. Bauers v. Heisel, *supra*. A "plethora" of cases in other circuits were in agreement. See Bauers v. Heisel, *supra*, at 586 n. 7.

In Pierson v. Ray, *supra*, the Supreme Court held explicitly that judges were immune from damage suits under the Civil Rights Act. In that case, several white and black clergymen on a "prayer" pilgrimage to promote integration were arrested and convicted of breach of peace after they had tried to use a segregated interstate bus terminal waiting room in Jackson, Mississippi. Because there was no evidence to support the charge, their conviction was reversed by the County Court. Thereafter, they initiated a § 1983 action against the arresting officers and the convicting judge. After reviewing the common law doctrine of judicial immunity and its scope, the Court stated:

> "We do not believe that this settled principle of law was abolished by § 1983, which makes liable 'every person' who under color of law deprives another person of his civil rights. The legislative record gives no clear indication that Congress meant to abolish wholesale all common-law immunities. Accordingly, this Court held in Tenney v. Brandhove, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951), that the immunity of legislators for actions within the legislative role was not abolished. The immunity of judges for acts within the judicial role is equally well-established, and we presume that Congress would have specifically so provided had it wished to abolish the doctrine." 386 U.S. 547, 554–555.

Pierson v. Ray controls the instant case. Judicial immunity is an absolute defense against a § 1983 action for damages allegedly suffered as a result of a judge's decision.[2] Plaintiff argues that because he alleged that Degen "intentionally and maliciously" violated his constitutional rights, this case is distinguishable from *Pierson*. But the court in *Pierson* explicitly anticipated this argument and drained it of any merit. "*[I]mmunity applies even when the judge is accused of acting maliciously and corruptly . . . .*" *Pierson, supra*, at 554 (emphasis added)

Unquestionably, in individual cases, injustice to litigants can result from ju-

2. In this Circuit, the rule has been reaffirmed countless times since *Pierson*. See, e. g., Robinson v. McCorkle, 462 F.2d 111 (3d Cir.), cert. denied, 409 U.S. 1042, 93 S. Ct. 529, 34 L.Ed.2d 492 (1972); Grove v. Rizzolo, 441 F.2d 1153 (3d Cir.), cert. denied, 404 U.S. 945, 92 S.Ct. 300, 30 L.Ed.2d 261 (1971); Turack v. Guido, 464 F.2d 535 (3d Cir. 1972); United States ex rel. Rauch v. Deutsch, 456 F.2d 1301 (3d Cir. 1972); Gaito v. Ellenbogen, 425 F.2d 845 (3d Cir. 1970).

dicial immunity. Accepting plaintiff's allegations in this case as true, District Justice Degen's decision certainly appears to lack a valid testimonial and procedural basis. When Schmidt took an appeal from that ruling, the Township, presumably in acknowledgement of the deficiencies in the evidence and in the proceedings, dropped all charges against plaintiff. Unquestionably, plaintiff was put to unnecessary inconvenience, humiliation and expense by the failure to observe the requirements of due process, but the Supreme Court was aware of these occasional costs when it decided *Pierson*. It had the benefit of Justice Douglas' eloquent dissent challenging the idea that immunity should protect "the judge who conspires with local law enforcement officers to 'railroad' a dissenter . . . knowingly turns a trial into a 'kangaroo' court . . . or intentionally flouts the Constitution in order to obtain a conviction." [3] *Pierson, supra*, at 566–567 (dissenting opinion of Douglas). Faced with these legitimate concerns, the court made a conscious policy decision on the grounds that have traditionally justified the doctrine. The cloak of judicial immunity

> " . . . 'is not for the protection or benefit of a malicious or corrupt judge, but for the benefit of the public, whose interest it is that judges should be at liberty to exercise their functions with independence and without fear of consequences.' (Scott v. Stansfield, L.R. 3 Ex. 220, 223 (1868), quoted in Bradley v. Fisher, *supra*, 349, note at 350 [80 U.S. 335, 20 L. Ed. 646]). It is a judge's duty to decide all cases within his jurisdiction that are brought before him, including

controversial cases that arouse the most intense feelings in the litigants. His errors may be corrected on appeal, but he should not have to fear that unsatisfied litigants may hound him with litigation charging malice and corruption. Imposing such a burden on judges would contribute not to principled and fearless decision-making but to intimidation." *Pierson, supra*, at 554.

Plaintiff also suggests that defendant Degen acted somehow outside her judicial jurisdiction in this case. In support of this proposition, he again "borrows" from the observations of Justice Douglas, that "the presence of malice and the intention to deprive a person of his civil rights is wholly incompatible with the judicial function. When a judge acts intentionally and knowingly to deprive a person of his constitutional rights he exercises no discretion or individual judgment; he acts no longer as a judge, but as a 'minister' of his own prejudices." *Pierson, supra*, at 567 n. 6 (dissenting opinion of Douglas). This position was rejected by the majority in *Pierson*, which, instead, reaffirmed the "clear absence—versus—mere excess of jurisdiction distinction" set forth in Bradley v. Fisher; *Pierson, supra*, at 554. Immunity is unavailable only to the judge acting in clear absence of jurisdiction, or in non-judicial activities.[4] *See, e. g.,* Bauers v. Heisel, *supra;* Lynch v. Johnson, 420 F.2d 818 (6th Cir. 1970); Moore v. Buck, 443 F.2d 25 (3d Cir. 1971); Littleton v. Berbling, 468 F.2d 389 (7th Cir. 1972). Because plaintiff has not alleged that defendant improperly took jurisdiction over his case, his argument that she should be denied im-

---

3. Justice Douglas' words were repeated virtually verbatim in plaintiff's counsel's brief without proper attribution. It is hoped that the omission was inadvertent.

4. Spires v. Bottorff, 317 F.2d 273 (7th Cir. 1963), illustrates a situation in which a judge can be liable in damages. There, an inmate of a state penitentiary sued a state judge alleging that the judge, after disqualifying himself, had persuaded the warden to try to prevent plaintiff from corresponding

with the clerk of the state court regarding his previous conviction. The Seventh Circuit held that the complaint stated a cause of action under the Civil Rights Act and that the judge could not invoke judicial immunity. Moreover, under Screws v. United States, 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495 (1944), the judge could not raise the defense that, by disqualifying himself, he was no longer acting under "color of state law" for § 1983 purposes.

munity because she abused her jurisdiction must fail.

Plaintiff also argues that a District Justice of the Peace, a relatively low-level member of the judiciary, is not entitled to the same sweeping degree of judicial immunity as a higher placed judge. In support of this proposition, he relies on Barr v. Matteo, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959), in which the Supreme Court defined the immunity accorded federal executive officials. This argument is unpersuasive. *Barr* established that immunity protects executive officers only for actions having a policy-making or judgmental element, so-called "discretionary" as opposed to "ministerial" functions. See Johnson v. Alldredge, 488 F.2d 820, 824 (3d Cir., 1973). Under *Barr,* the determining factor in whether immunity attaches is the nature of the official action challenged, not the rank of the official. "To be sure, the occasions upon which the acts of the head of an executive department will be protected by the privilege are doubtless far broader than in the case of an officer with less sweeping functions. But that is because the higher the post, the broader the range of responsibilities and duties, and the wider the scope of discretion, it entails." *Barr, supra,* at 573. In contrast, in the judiciary, there is no such relationship between the level of a judge's position and the extent of the "discretionary" functions he must perform. A judge's decision-making function is by definition "discretionary." For this reason, the "discretionary"—"ministerial" distinction is seldom employed in the judicial context.[5] In her decision-making function, when dealing with matters within her jurisdiction, defendant Degen has precisely the same judicial immunity from suits for dam-

ages as any other judge, irrespective of level. It should be remembered that Pierson v. Ray itself dealt with the immunity of a justice of the peace, and the Court nowhere suggests the type of hierarchal formula which plaintiff advances.

Plaintiff's remaining argument is that the Supreme Court's recent decision in Scheuer v. Rhodes, —— U.S. ——, 94 S.Ct. 1683, 40 L.Ed.2d 90, 42 L.W. 4543 (1974), altered the parameters of judicial immunity against a civil rights suit for damages. In that case, petitioners, representatives of the estates of students who were killed on the campus of Kent State University in 1970, brought damage actions against the governor, head of the National Guard, various guard members and the University President, charging them with intentionally and recklessly causing the deployment of the Guard on campus which resulted in the killings. In reversing the dismissal of the complaint, the Supreme Court held only that executive immunity is not absolute, and that a suit for damages under § 1983 against executive officers could not be dismissed without further proceedings to ascertain whether defendants' actions were the sort to which immunity ordinarily attaches. This decision, built upon the established principle that executive immunity is qualified, does not alter the broad sweep of judicial immunity. As my colleague, Judge VanArtsdalen, recently observed in Cohen v. Levin, C.A. No. 74–641, May 16, 1974, at 5

> "Footnote 4 of the [Scheuer] opinion recognizes the broader sweep of judicial immunity. Footnote 7 cites with apparent approval, Yaselli v. Goff, 12 F.2d 396 (2d Cir. 1926), aff'd per curiam, 275 U.S. 503 [48 S.Ct. 155, 72 L.Ed. 395] (1927), which decided that

---

5. In those relatively rare cases when a judge is sued for his performance of a "ministerial" task, judicial immunity will not protect him. In Ex parte Virginia, 100 U.S. 339, 25 L.Ed. 676 (1879), the Court held that a judge who excluded blacks from the jury rolls could be held liable, because selecting prospective jurors was a "ministerial" task "often given to county commissioners, or su-

pervisors, or assessors." 100 U.S. at 348. Cf. Perkins v. United States Fidelity & Guaranty Co., 433 F.2d 1303 (5th Cir. 1970) in which the Fifth Circuit rejected the argument that a probate judge's responsibility of deciding whether a person should be committed to a state mental institution was a "ministerial" function.

a special United States prosecutor was immune from civil liability even if the prosecutor acted maliciously and conspiratorially. In that case, the Second Circuit stated: '[t]he immunity is absolute, and is grounded on principles of public policy.' 12 F.2d at 406."

Additionally, the court in *Scheuer* quoted approvingly (42 L.W. at 4547) from Pierson v. Ray and its discussion of judicial immunity, without intimating any change of viewpoint on the subject.

The foregoing analysis of judicial immunity applies only to suits for damages. As a general rule, the immunity doctrine will not preclude the granting of equitable relief against judicial or quasi-judicial officials. *See, e. g.,* Conover v. Montemuro, 477 F.2d 1073 (3d Cir. 1973); Jacobson v. Schaefer, 441 F.2d 127 (7th Cir. 1971); Littleton v. Berbling, 468 F.2d 389 (7th Cir. 1972); Mills v. Larson, 56 F.R.D. 63 (W.D.Pa. 1972). Beyond the *pro forma* request for all relief that the court deems "appropriate, fair and equitable," plaintiff's suit against defendant Degen seeks only damages. The injunctive relief he asks —an order that the record of his arrest and detention be expunged—would, if granted, be directed against the police officer defendants.