**Walter FIALKOWSKI et al.**

v.

**Milton SHAPP, Governor of Pennsylvania, et al.**

**Civ. A. No. 74-2262.**

United States District Court,
E. D. Pennsylvania.

Dec. 17, 1975.

948

Allen C. Warshaw, Dept. of Justice, Com., of Pa., Harrisburg, Pa., Robert T. Lear, The School District of Philadelphia Bd. of Ed., Philadelphia, Pa., for defendants.

## MEMORANDUM AND ORDER

HUYETT, District Judge.

Invoking 42 U.S.C. § 1983 and its jurisdictional counterpart, 28 U.S.C. § 1343, plaintiffs bring this action for damages claiming that defendant state and city officials have violated their rights to an appropriate education under the equal protection and the due process clauses of the Fourteenth Amendment to the Constitution. Plaintiffs contend that, as multiple-handicapped children, they are denied equal protection under the Constitution because unlike the programs offered to normal and less severely retarded children, the nature of the educational programs offered them is such that no chance exists that the programs will benefit. Plaintiffs then allege that all named defendants shared in some part of the duty to provide them appropriate education and that each defendant knowingly and maliciously violated this duty.

Plaintiffs in this action, represented by their parents, are Walter and David Fialkowski. At the time the complaint was filed, Walter was 21 years old with a mental age of 19 months and David was 12 years old with a mental age of 15 months. In September 1972, Walter and David were students at the Longfellow School for the multiple-handicapped. In December 1972 their parents withdrew them from school and demanded a hearing on an alternate placement since, the Fialkowskis allege, Longfellow School did no more than babysit for their sons because it offered no training appropriate to their learning capacities.[1]

Jordon R. Pitock, Philadelphia, Pa., for plaintiffs.

---

1. The Fialkowskis argue that instead of teaching their sons such essential self-help skills as how to dress, how to eat and how to walk, the school made an effort to teach the boys academic subjects.

In accordance with the procedures established in *Pennsylvania Association For Retarded Children v. Commonwealth of Pennsylvania (PARC)*, 343 F.Supp. 279 (E.D.Pa.1972),[2] a hearing was held in May 1973 at which time the hearing examiner found Walter and David to be in need of training for the multiple-handicapped and reassigned them to Longfellow School. Apparently the Fialkowskis took no further action until they filed this lawsuit. Neither did they send their sons back to school. Walter is now past school age.

Defendants include local school district officials of the city of Philadelphia and four officials of the Commonwealth of Pennsylvania: Milton Shapp, Governor; Israel Packel, former Attorney General; John Pittenger, Secretary of Education; and Joseph Lantzer, former Director of the Right to Education Office. Before us are four motions to dismiss. Having carefully considered the various grounds for dismissal advanced by these motions, we grant the motions to dismiss of defendants Shapp and Packel; we deny the motions of the other defendants.

### PERSONAL INVOLVEMENT ISSUE

In considering defendants' motions to dismiss, we must accept the material allegations of the complaint as true. *Bond v. County of Delaware*, 368 F.Supp. 618, 621 (E.D.Pa.1973). In addition, plaintiff is entitled to any favorable inferences arising out of facts pleaded. *Ammlung v. City of Chester*, 355 F.Supp. 1300, 1303 (E.D.Pa.1973), aff'd. 494 F.2d 811 (3rd Cir. 1974). In *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1973), Chief Justice Burger announced certain

guidelines to be followed by federal courts in these cases:

When a federal court reviews the sufficiency of a complaint, before the reception of any evidence either by affidavit or admissions, its task is necessarily a limited one. The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test. Moreover, it is well-established that, in passing on a motion to dismiss . . . the allegations of the complaint should be construed favorably to the pleader.

"[I]n appraising the sufficiency of the complaint we follow . . . the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45[–46], 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957).

Although notice pleading is generally sufficient, courts have found it necessary to impose a special pleading limitation in civil rights actions in order to identify and dismiss frivolous suits. This court has ruled that complaints in these cases must be specifically pled or be subject to dismissal. Citing *Valley v. Maule*, 297 F.Supp. 958, 960–61 (D. Conn.1968), Judge Green stated in *Downs v. Dept. of Public Welfare*, 368 F.Supp. 454, 463 (E.D.Pa.1973), that

[i]n recent years there has been an increasingly large volume of cases brought under the Civil Rights Acts.

2. By order of the court dated May 5, 1972, and in conjunction with a consent decree, the three-judge court in *PARC* enjoined the Commonwealth "to provide, as soon as possible but in no event later than September 1, 1972, to every retarded person between the ages of six and twenty-one years as of the date of this Order and thereafter, access to a free public program of education and training appropriate to his learning capacities." The Commonwealth was also enjoined to provide notice and a hearing before any change in the educational status or classification of a child and before any re-evaluation of the status or classification of a child. 343 F.Supp. at 302–03.

A substantial number of these cases are frivolous or should be litigated in the State courts; they all cause defendants—public officials, policemen and citizens alike—considerable expense, vexation and perhaps unfounded notoriety. It is an important public policy to weed out the frivolous and insubstantial cases at an early stage in the litigation, and still keep the doors of the federal courts open to legitimate claims.

Thus we must weigh the policy of requiring factual specificity in pleading in our assessment of defendants' motions to dismiss.

■ The first motion for us to consider is Commonwealth defendants' claim that insufficient allegations of personal involvement are grounds for dismissal. Personal involvement is a necessary element of a § 1983 action *Downs v. Dept. of Public Welfare, supra* at 463. The general statutory requisites for recovery are that the conduct complained of must have been engaged in under color of state law, and that such conduct subjected plaintiff to deprivation of a constitutional right. In order to state a claim for relief, then, plaintiff must specifically allege a direct causal link between some official conduct of each Commonwealth defendant and the alleged constitutional deprivations.

■ Defendants concede that the requirement of personal involvement does not necessarily mean that the official must have committed the specific wrongful acts. It is also true that when an official directs his subordinates to commit acts, or when he has actual knowledge of their acts and acquiesces in them, he is regarded as having been personally involved and is liable for his own conduct. *Downs v. Dept. of Public Welfare, supra.* In *Byrd v. Brishke,* 466 F.2d 6, 10 (7th Cir. 1972), the Seventh Circuit recognized that an official's failure to act may be an actionable offense under § 1983, stating that "where the defendant is under some affirmative duty to act and he fails to act accord-

ingly, he may be held negligently responsible for his omission. He is responsible if his omission is unreasonable in light of the circumstances." Unfortunately, the line that determines "unreasonable omissions" is obscure. The cases do suggest, however, that in situations where an official has direct supervisory control over persons committing the alleged violations, the supervisor's general knowledge of the situation triggers an affirmative duty to investigate further. Assuming that a valid constitutional claim has been raised, the official's failure to take any disciplinary action against his subordinates constitutes a breach of the duty owed to those persons injured and a direct cause of their continuing deprivations.

In *Moon v. Winfield,* 368 F.Supp. 843 (N.D.Ill.1973), plaintiff sought monetary damages from the superintendent of police of the city of Chicago, alleging that he was responsible for beatings inflicted upon plaintiff by a police officer. While plaintiff did not claim that the superintendent had ordered the attack, had witnessed the attack, or had ever known of the attack, the complaint was not dismissed for lack of personal involvement. In refusing to dismiss, the court was persuaded by the fact that the superintendent had received information that the policeman had been the subject of complaints for using excessive force and had taken no disciplinary action against him. The court considered defendant's conduct unreasonable under the circumstances, finding that "responsibility obviously obtains when the nonfeasor is a supervisory officer to whose direction misfeasor officers are committed."

In *Wright v. McMann,* 460 F.2d 126 (2nd Cir.), *cert. denied,* 409 U.S. 885, 93 S.Ct. 115, 34 L.Ed.2d 141 (1972), an inmate was awarded damages against the warden for the cruel and unusual punishment inflicted in connection with the inmate's confinement to a "strip cell." While the warden did not order the placement and was not aware that plaintiff was in solitary confinement, evidence in the record allowed the court to

conclude that the warden must have actually known of the "strip cell" conditions at the time in question. The court went on to say that even if defendant possessed no specific knowledge of the alleged deprivations, the fact that he had ultimate responsibility for the operation of the cells was sufficient to charge him with having had constructive knowledge of the actual conditions in the prison. *See Holland v. Connors,* 491 F.2d 539 (5th Cir. 1974).

■ Thus findings of general knowledge combined with direct supervisory control may be sufficient to hold an official personally involved in the unlawful acts of his subordinates. Viewed in this manner, the motion to dismiss must be denied as to defendants Pittenger and Lantzer. Plaintiffs specifically allege that defendant Pittenger was directly responsible for the administration and supervision of the state's public educational system, including the placement and education of retarded children. It is further alleged that Pittenger had set forth the requirements that the local school districts are expected to meet and that he had the duty and the authority to supervise directly plaintiffs' education if the Philadelphia School District was unwilling to provide plaintiffs with a meaningful education. Besides having the authority and the duty to act, Pittenger was in a position of direct control over the actions of the local school districts. He was directly responsible for appointing hearing examiners to investigate challenges of the local school districts' placement transfers of retarded children. In addition, Pittenger personally received and judged all appeals from decisions of the hearing examiners. In regard to defendant Lantzer, plaintiffs claim that he was responsible for insuring that retarded children be placed in appropriate educational programs according to the standards established by the Secretary of Education. Thus one can reasonably infer that either by virtue of his own position or through contact with his supervisor, defendant Pittenger, defendant Lantzer also had direct supervisory control over the policies of the local school district.

The official positions of both Pittenger and Lantzer were such, then, that a duty to act could be triggered upon defendants receiving information that the local school district had failed to comply with the state's educational placement standards. In their complaint, plaintiffs allege that these defendants knew of widespread violations by the local school district depriving retarded children of any meaningful education. Plaintiffs' complaint is specific as to the nature of the violation, the source of the violation, the time when the violation occurred, and the class of persons being deprived.

Nonetheless, defendants claim that they cannot be considered personally involved since they had no knowledge of plaintiffs' unique position. Considering the authority and responsibility assumed by these defendants, however, they could still be held liable for not correcting plaintiffs' situation despite the fact that they did not know plaintiffs' names. Perhaps defendants will ultimately show that they lacked even general knowledge of the operations of the Philadelphia School District. Summary dismissal, however, is not proper unless plaintiff can in no event prevail on the merits. We cannot reach such a conclusion at this early stage of the proceeding.

■ The more perplexing problem is how to rule on defendants Shapp's and Packel's motion to dismiss. Unlike the allegations made about defendants Pittenger and Lantzer, the allegations about defendants Shapp and Packel do not include a claim that they had direct supervisory control over the actions of the Philadelphia School District. In regard to Governor Shapp, plaintiffs allege only that as the state's chief executive officer, he had a duty to insure that public education was provided in accordance with the Constitution of the United States. As Governor, Shapp exercised general supervisory powers as to all state activities, including education. Plaintiffs concede in their brief, however, that the PARC consent decree stipulated that

it was the Secretary of Education rather than the Governor who assumed direct responsibility to "provide, maintain, administer, supervise and operate" meaningful programs for the education and training of retarded children in the event that the local school district failed to comply with the requirements of the order. Similarly, defendant Packel, as Attorney General of Pennsylvania, is charged generally with the enforcement of the laws of the state, including the procedural regulations to be followed in dealing with retarded children. Defendants argue that the Attorney General is legal advisor for all state departments and agencies, and that his power and ability to take action to remedy local problems is limited, especially where those problems are functional, rather than legal. Defendants therefore claim that the Attorney General had at most indirect supervisory control over the Philadelphia School District.

The difficult issue raised by defendants Shapp and Packel is how far up the line of authority should courts impose liability upon public officials for their failure to stop civil rights violations committed by subordinates. What appears critical in our case is the fact that the buck stopped at the Secretary of Education's office. In other words, pursuant to the consent decree defendant Pittenger had full authority to correct the violations committed by the Philadelphia School District without requiring the assistance or approval of either the Governor or the Attorney General. Since the Secretary of Education was not required to report or to be responsible to any higher official in this area, we cannot conclude that either the Governor or the Attorney General had direct supervisory control over the Philadelphia School District. Thus we are unwilling, absent more specific allegations of personal involvement on their parts, to hold either defendant Shapp or Packel liable for conditions which defendant Pittenger could have corrected. Under our facts neither the Governor's nor the Attorney General's alleged omissions can be considered a proximate cause of the alleged violations.

If, as plaintiffs suggest, the criteria for a finding of sufficient personal involvement are merely whether the official has (1) notice of a constant and continuing deprivation, and (2) the means to remedy the situation, plaintiffs instituting § 1983 actions will invariably seek monetary damages from high-level officials such as the Governor and Attorney General. These officials may in fact receive hundreds of reports every year notifying them of malfunctions in the operation of state and local programs. Many of these malfunctions may result in civil rights violations. Nevertheless, although these officials are in a position to order subordinates to act to stop committing violations or to seek judicial action to prevent these abuses, it would be unfair, unworkable, and a dangerous curb on governmental functioning to hold them liable in damages for each such violation on the basis of their knowledge of general administrative problems. As a practical matter, high-level officials with state-wide responsibilities cannot be expected to deal personally with every such problem on a regular basis. To hold them liable for a failure to do so would be to impute to them power which does not exist.

█ Defendants are correct in arguing that the mere failure of an official in some superior position to act to stop alleged violations of civil rights does not constitute the kind of acquiescence necessary to sustain an action for damages for a specific violation, at least in those cases where defendant official does not directly and closely supervise those persons actually committing the wrongful acts. Although courts have provided little explicit guidance in this area, they are obviously reluctant to find high-level officials liable in damages when plaintiffs allege nothing more than general knowledge plus a mere failure to act. Instead, plaintiffs must usually allege that defendant official participated in, approved of, or was present during the

violation to satisfy the personal involvement requirement of a § 1983 cause of action. *See Brown v. Sielaff,* 474 F.2d 826 (3rd Cir. 1973); *Diamond v. Marland,* 395 F.Supp. 432, 443 n. 11 (S.D. Ga.1975); *Ammlung v. City of Chester, supra.*

In *Downs v. Dept. of Public Welfare, supra,* plaintiffs brought a civil rights action for monetary damages against the Secretary of the Department of Public Welfare for forcing them to work without pay while they were patients in a state mental hospital. Despite the allegation that the Secretary had expressed opposition to the system of forced labor in state institutions, the court dismissed the complaint for "inadequate factual allegations as to knowledge, acquiescence in, or direct involvement in coercive activities." The court noted that in cases where plaintiff seeks monetary rather than injunctive relief against high-level officials, the requirement of factual specificity as to claims of personal involvement is more stringent.

In *Pinon v. State of Wis.,* 368 F.Supp. 608 (E.D.Wis.1973), plaintiff sought damages for the death of her son, alleging that he was in urgent need of medical care while an inmate at a state correctional institution and failed to receive such care. The court denied a motion to dismiss as to the institutional medical director and a registered nurse who were found to have been entrusted with direct responsibility for the operation of the medical program. On the other hand, the court granted the institutional warden's motion to dismiss on the grounds that the complaint failed to allege that the warden had direct supervisory control over the care provided to plaintiff's son, that he had committed any wrongful acts, or that he had specific knowledge of plaintiff's son's actual condition.

In *Landman v. Royster,* 354 F.Supp. 1302 (E.D.Va.1973), prisoners sought damages from prison authorities under § 1983 for injuries attributable to constitutional deprivations. After a trial on the merits, the court found that the corrections director was personally involved. The court noted that he had approved and personally cooperated in the actions of subordinates, and by his actions had encouraged the treatment accorded plaintiffs. The State Director of Welfare and Institutions, however, was not found personally involved, despite the fact that he knew of several practices and of the general conditions of the prison from both reports and personal visits. This finding turned on the fact that the Director had no direct supervisory control over the illegal acts complained of and therefore should not be held responsible where he had no actual knowledge of the deprivations suffered by plaintiff nor did he commit any overt acts which caused such violations to continue.

More recently, the same court in *Taliaferro v. State Council of Higher Education,* 372 F.Supp. 1378 (E.D.Va. 1974), considered a class action § 1983 suit in which plaintiffs sought monetary relief for alleged discrimination in the hiring, firing, promotion and administrative treatment of female teachers at state institutions of higher education. A motion to dismiss the Governor of Virginia was granted for lack of personal involvement in the alleged deprivations. In regard to the personal involvement issue, the court stated that

[i]n the absence of specific acts by persons in charge, proof of acquiescence can be advanced through a showing of "a pattern of close supervision by the defendants and that the acts themselves complained of were part of a consistent pattern of conduct of the subordinates." *Id.* at 1385, *citing Cook v. Cox,* 357 F.Supp. 120, 126 (E. D.Va.1973).

Neither Shapp nor Packel were aware of plaintiffs' unique situation. Nor did plaintiffs allege that defendants committed any overt acts of personal involvement. For these reasons and in the absence of claims that defendants directly supervised the local school district,

we grant the motion of defendants Shapp and Packel to dismiss.

## IMMUNITY ISSUE

■■■ Commonwealth defendants also move to dismiss on the ground that they are immune from suit. First, defendants claim Eleventh Amendment immunity under *Edelman v. Jordan*, 415 U.S. 951, 94 S.Ct. 1374, 39 L.Ed.2d 662 (1974). The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State . . . ." Although the Eleventh Amendment is not literally applicable since the Fialkowskis are citizens of Pennsylvania, it is established that an unconsenting state is immune from suits brought in the federal courts by its own citizens as well as citizens of another state. *Hans v. Louisiana*, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1889). The Eleventh Amendment also bars suits against a state when, although unnamed as a party, the state is the only real party against which relief is asked and against which the judgment or decree would operate. *See Scheuer v. Rhodes*, 416 U.S. 232, 237–38, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). In this § 1983 action, however, plaintiffs seek monetary relief against the individual defendants in their personal capacities. The state bears no liability for the actions of defendants nor are defendants being sued as a subterfuge to raid the state treasury. *Compare Edelman v. Jordan, su-*

*pra; Great Northern Life Insurance Co. v. Read*, 322 U.S. 47, 54, 64 S.Ct. 873, 88 L.Ed. 1121 (1944). Thus, the Eleventh Amendment does not bar monetary relief in this action. *See Scheuer v. Rhodes, supra; Rochester v. White*, 503 F.2d 263, 268 n. 12a (3d Cir. 1974).

Secondly, Commonwealth defendants cite *Barr v. Matteo*, 360 U.S. 564, 79 S. Ct. 1335, 3 L.Ed.2d 1434 (1959), for the proposition that they are entitled to official immunity from liability under § 1983 by virtue of the discretionary nature of their duties. In *Barr* a defamation suit was brought against an executive official. Finding that the official had acted pursuant to discretionary rather than ministerial powers and that the allegedly libelous statements were made within the scope of his authority, the Supreme Court held that the official's remarks were absolutely privileged. Subsequent decisions, however, strongly suggest that although an executive official may be absolutely immune when monetary relief is sought in an ordinary tort action, courts must apply a different standard to a claim brought under the Civil Rights Act for the deprivation of a constitutional right.

In *Scheuer v. Rhodes, supra*, a § 1983 suit was brought against the Governor of Ohio and the Adjutant General of the Ohio National Guard, alleging that the defendants had violated the constitutional rights of three Kent State students killed by the Ohio National Guard. In what appears to be an implicit rejection of *Barr's* absolute immunity doctrine in these types of cases,[3] the Court in *Scheuer* stated that

3. In *Scheuer* the Court cited *Barr* only three times. First, the Court referred to *Barr* in its discussion of the history of the general concept of immunity in England. 416 U.S. at 240 n. 4, 94 S.Ct. 1683. Interestingly, *Barr's* only mention of early English law on immunity appears in Chief Justice Warren's dissenting opinion. 360 U.S. at 580–82, 79 S.Ct. 1335.

The second citation to *Barr* appears in the *Scheuer* Court's discussion of the policy considerations underlying the notion that execu-

tive officials should be granted some form of immunity:

> The concept of immunity assumes . . . that it is better to risk some error and possible injury from such error than not to decide or act at all. In *Barr* . . . the Court observed, *in the somewhat parallel context of the privilege of public officers from defamation actions*, "[T]he privilege is not a badge or emolument of exalted office, but an expression of a policy designed to aid in the effective functioning of government."

in varying scope, a qualified immunity is available to officers of the executive branch of Government, the variation [being] dependent upon the scope of discretion and responsibilities of the office and all the circumstances as they reasonably appeared at the time of the action on which liability is sought to be based. It is the existence of reasonable grounds for the belief formed at the time and in light of all the circumstances, coupled with good faith belief, that affords a basis for qualified immunity of executive officers for acts performed in the course of official conduct. 416 U.S. at 247–48, 94 S.Ct. at 1692.

The Court then expanded this "qualified good faith immunity doctrine" in *Wood v. Strickland*, 420 U.S. 308, 95 S. Ct. 992, 43 L.Ed.2d 214 (1975). In *Wood* high school students who had been expelled from school for violating a school regulation prohibiting the use or possession of alcoholic beverages at school brought a § 1983 action against school officials, claiming the expulsions abridged their constitutional rights to procedural due process. Although defendants were not found to have acted with malice, the Supreme Court held that defendant school officials were

not absolutely immune from liability for damages under § 1983.[4] The Court cast the appropriate standard in objective as well as subjective terms. In articulating the test of good faith, Justice White stated that

a school board member is not immune from liability for damages under § 1983 if he knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the student affected, or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury to the student. That is not to say that school board members are "charged with predicting the future courses of constitutional law." . . . A compensatory award will be appropriate only if the school board member has acted with such an impermissible motivation or with such disregard of the student's clearly established constitutional rights that his action cannot be reasonably characterized as being in good faith. 420 U.S. at 322, 95 S.Ct. at 1001.[5]

Thus it is clear that absolute immunity is not a defense to a § 1983

---

416 U.S. at 242, 94 S.Ct. at 1689 (emphasis added).

Finally, turning to the ultimate question—whether the immunity of executive officials under § 1983 is absolute or qualified—the *Scheuer* Court concluded that the statute did not intend to exempt totally all government officials, by virtue of a claim of absolute immunity, from liability under its terms. Holding that executive officials, unlike legislators or judges, are afforded only a qualified immunity, subject to a good faith defense, the Court instructed that in considering whether an official acted in good faith, courts must take cognizance of the scope of discretion and responsibilities of office. The Court then cited the views expressed by Justice Harlan, "in a context other than a § 1983 suit," that due to the broad range of duties and responsibilities assumed by high level officials "the occasions upon which the acts of [high level officials] will be protected by the privilege are doubtless far broader than in the case of an officer with less sweeping functions."

416 U.S. at 247, 94 S.Ct. at 1692, *citing Barr v. Matteo*, 360 U.S. at 573, 79 S.Ct. 1335.

4. Interestingly, the Court in *Wood* never mentions *Barr v. Matteo, supra.* This omission provides further evidence that the *Barr* absolute immunity doctrine is inapplicable in § 1983 actions.

5. Last term the Court ordered that the *Wood* test be applied beyond the context of school discipline. *O'Connor v. Donaldson*, 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975). The Court in *O'Connor* vacated a judgment assessing damages against a hospital superintendent for deprivation of liberty of mental patients and remanded the case with the instruction that the court of appeals reconsider defendant's good faith defense in light of the test formulated in *Wood*. In addition, the Court of Appeals for the Seventh Circuit recently applied *Wood* to a challenge to the official conduct of correctional administrators. *Knell v. Bensinger*, 522 F.2d 720 (7th Cir. 1975).

action against government officials exercising discretionary authority. *See Schmidt v. Degen,* 376 F.Supp. 664, 669 (E.D.Pa.1974). In order to prevail on their claim of immunity defendants must allege and establish on the record a good faith defense as articulated by the Court in *Wood.* Such a determination cannot be made on the basis of the allegations in the complaint. *E. g., Paton v. LaPrade,* 524 F.2d 862, 872–73 (3rd Cir. 1975); *Rowley v. McMillan,* 502 F.2d 1326, 1335 (4th Cir. 1974); *Lasher v. Shafer,* 460 F.2d 343, 348 (3rd Cir. 1972); *Taliaferro v. State Council of Higher Education,* 372 F.Supp. 1378, 1382 (E.D.Va.1974). While record evidence may subsequently establish for defendants a good faith defense, good faith has not at this point been shown. Hence defendants' claim of immunity is premature and their motion to dismiss on this ground will be denied.

## EXHAUSTION OF STATE REMEDIES ISSUE

The final argument upon which Commonwealth defendants base their motion to dismiss is that plaintiffs failed to exhaust administrative remedies.[6] They argue that pursuant to the *PARC* consent decree, the Commonwealth instituted an appeal procedure by which persons, such as plaintiffs, who are not satisfied with the results of a proposed placement, may raise in issue the suitability and appropriateness of the proposed placement. Since plaintiffs failed to appeal the decision of the hearing examiners and instead refused to send their children to school, defendants claim that the court lacks jurisdiction to hear this case.

Defendants' argument is not persuasive. The Supreme Court appears to have treated the law as settled that the exhaustion of remedies doctrine is not applicable when an otherwise good cause of action is brought under § 1983. *E. g., Allee v. Medrano,* 416 U.S. 802, 94 S.Ct. 2191, 40 L.Ed.2d 566 (1974); *Steffel v. Thompson,* 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974); *Metcalf v. Swank,* 406 U.S. 914, 92 S.Ct. 1778, 32 L.Ed.2d 1113 (1972); *Carter v. Stanton,* 405 U.S. 669, 92 S.Ct. 1232, 31 L.Ed.2d 569 (1972); *Wilwording v. Swenson,* 404 U.S. 249, 92 S.Ct. 407, 30 L.Ed.2d 418 (1971). That provision creates a remedy separate from and in addition to any state remedies. *Houghton v. Shafer,* 392 U.S. 639, 640, 88 S. Ct. 2119, 20 L.Ed.2d 1319 (1968); *King v. Smith,* 392 U.S. 309, 312 & n. 4, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968); *Damico v. California,* 389 U.S. 416, 417, 88 S.Ct. 526, 19 L.Ed.2d 647 (1967); *McNeese v. Bd. of Education,* 373 U.S. 668, 671, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1962); *Monroe v. Pape,* 365 U.S. 167, 183, 81 S.Ct. 473, 5 L.Ed.2d 492 (1960). Since we do conclude that plaintiffs' claim that a denial of a minimally adequate education violates their rights under the Fourteenth Amendment raises a colorable constitutional challenge, plaintiffs are thereby entitled to seek relief in a federal forum without regard to whether state administrative remedies were pursued. *See McCray v. Burrell,* 516 F.2d 357, 361–65 (4th Cir. 1975), *petition for certiorari filed,* 44 U.S.L.W. 3072 (August 5, 1975); *Burnett v. Short,* 441 F.2d 405, 406 (5th Cir. 1971).

We recognize, however, that several lower courts have questioned the proposition that the exhaustion doctrine is never applicable to actions brought under § 1983 and have suggested that dismissal should be warranted where plaintiff failed to utilize a state remedy that offered plaintiff prompt and complete redress. *See, e. g., Eisen v. Eastman,* 421 F.2d 560, 569 (2nd Cir. 1969), *cert. denied,* 400 U.S. 841, 91 S.Ct. 82, 27 L. Ed.2d 75 (1970); *Kochie v. Norton,* 343 F.Supp. 956 (D.Conn.1972). Nevertheless, the Supreme Court has on repeated occasions refused to establish an exhaustion requirement in these cases

---

6. City defendants also contend that the complaint should be dismissed for failure to exhaust administrative remedies.

and we do not choose to depart from such overwhelming authority. Thus we hold that exhaustion is not required.

■ Although we express no opinion on the appropriateness of a different course of decision, even if the exhaustion of remedies doctrine were applicable to § 1983 actions, we still could not dismiss this complaint. Discussing the applicability of the exhaustion doctrine in § 1983 cases, the court in *Hayes v. Cape Henlopen School District*, 341 F. Supp. 823, 831 (D.Del.1972), stated that "absent a clear showing that the state administrative procedures afford a realistic alternative for an aggrieved litigant, the exhaustion doctrine should not be implemented." Despite defendants' contentions, it is by no means clear that Pennsylvania law affords plaintiffs adequate administrative relief. The *PARC* consent decree provides that the decision of a hearing examiner on the appropriateness of a child's educational placement can be appealed to the Secretary of Education. If, upon review of the record, the Secretary finds that the proposed placement is inappropriate, he is authorized to make suitable corrections. Plaintiffs, however, do not request a change in placement. They seek only damages for the harm caused by an inadequate educational program.[7] The Secretary of Education possesses no power to award such damages. While the consent agreement provides the machinery for challenging placement, it does not provide any compensation for past injuries. Plaintiffs seeking such damages therefore have the right to embrace the independent cause of action offered by § 1983.

■ Furthermore, plaintiffs claim that the procedural safeguards afforded them were meaningless because they were never given a chance to challenge effectively the appropriateness of the program offered at Longfellow School. Plaintiffs allege that the hearing examiners determine only whether the child is in a state-certified program but do not determine whether or not the program measures up to the state certification. Since on appeal the Secretary reviews only the procedures employed in the initial hearing and whether the evidence presented by the school board justified the child's being classified as retarded educable, retarded trainable, etc., plaintiffs contend that the Secretary also does not examine the content of the specific program offered. Instead the only relief the Secretary grants is continuation of the present program or a new hearing. Although the *PARC* procedural safeguards may prevent total exclusion from *school*, they may not be adequate to prevent total exclusion from *education*. In the absence of any machinery for the submission, evaluation and resolution of their complaints, plaintiffs are not afforded an adequate administrative remedy. *Comprehensive Group Health Service Board of Directors v. Temple University*, 363 F.Supp. 1069, 1097 (E.D.Pa.1973). In short the exhaustion of state remedies by these plaintiffs is likely to be futile; hence they are not required to resort to such remedies before being permitted to institute this § 1983 action.

## CONSTITUTIONAL ISSUE

■ City defendants, relying on *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973), argue that plaintiffs have no claim because there is no fundamental right to education. They also argue that the question of the appropriateness of the program into which Walter and David Fialkowski were placed does not rise to a constitutional level.

Although a broad reading of *Rodriguez* might support defendants' contention, we construe its holding more narrowly and conclude that *Rodriguez* does not foreclose plaintiffs' equal protection claim. *Rodriguez* involved an attack upon the constitutionality of a method of financ-

7. Since Walter Fialkowski is now past school age, monetary relief appears to be his only available remedy.

ing public education, partly through revenues collected from local property taxes, that resulted in differences in the per-pupil expenditures among the various school districts. Plaintiffs did not allege, however, that any student received less than an adequate education. In rejecting the attack, the Court held that when a state educational system affords minimally adequate educational opportunities to all children, that some children are afforded greater opportunities than others does not amount to a denial of equal protection so long as the differences bear a rational relation to a legitimate state interest. Based on our reading of *Rodriguez,* then, we find that the constitutional challenge in the case at bar is distinguishable from that in *Rodriguez* on several grounds.

First, the Fialkowskis allege that their children are being completely denied educational opportunity, not that Walter and David are being afforded a lesser quality of education than other classes of children. In its discussion of the right to education in *Rodriguez,* the Court stated:

> Whatever merit appellees' argument *might have if a State's financing* system occasioned an absolute denial of educational opportunities to any of its children, that argument provides no basis for finding an interference with fundamental rights where only relative differences in spending levels are involved and where . . . no charge fairly could be made that the system fails to provide each child with an opportunity to acquire the basic minimal skills necessary for the enjoyment of the rights of speech and of full participation in the political process.[8] 411 U.S. at 37, 93 S.Ct. at 1299.

It would thus appear not inconsistent with *Rodriguez* to hold that there exists a constitutional right to a certain minimum level of education as opposed to a constitutional right to a particular level of education.

■■■ Secondly, *Rodriguez* should be read in its peculiar factual setting involving a Texas property tax plan for financing educational facilities. The Supreme Court has recognized the great importance of education in our society. In *Brown v. Board of Education,* 347 U.S. 483, 493, 74 S.Ct. 686, 691, 98 L.Ed. 873 (1954), the Court said that

> education is perhaps the most important function of state and local governments. . . . In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education. Such an opportunity, where the state has undertaken to provide it, is a right which must be made available to all on equal terms.

*Rodriguez* stands, then, for the proposition that equal educational opportunity is not measured in terms of equal financial expenditures. The claim of plaintiffs is on a different footing, however, Plaintiffs argue that equal educational opportunity, as a constitutional standard, should be defined to include equal access to minimal educational services. At this early stage of litigation, we cannot find this distinction invalid.

■■■ Thirdly, plaintiffs argue that we should strictly scrutinize their claims because retarded children are a suspect class. Reviewing the characteristics of a suspect class as the Supreme Court has identified them, we find a certain immediate appeal to plaintiffs' argument. The Court in *Rodriguez,* for example, set forth the following criteria for determining what constitutes a suspect class:

> [a] class . . . saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command ex-

---

8. There can be no doubt that the denial of an adequate education to a retarded child is a denial of the opportunity to acquire the basic skills of citizenship, and may result in the loss of freedom from later state institutionalization. *Child's Right to an Effective Minimal Education,* 36 Ohio State L.J. 349, 363 (1975).

traordinary protection from the majoritarian political process. 411 U.S. at 28, 93 S.Ct. at 1294.

Such a test could certainly be read to include retarded children. Retarded children are precluded from the political process and have been neglected by state legislatures.[9] Moreover, the label "retarded" might bear as great a stigma as any racial slur. In *Interest of G. H.*, 218 N.W.2d 441 (1974), the Supreme Court of North Dakota accepted the argument that the handicapped should be classified as suspect and distinguished *Rodriguez* on this basis.

> While the Supreme Court of the United States, using the "traditional" equal-protection analysis, held that the Texas system of educational financing, which relied largely upon property taxes, was constitutional, we are confident that the same Court would have held that G.H.'s terrible handicaps were just the sort of "immutable characteristics determined solely by the accident of birth" to which the "inherently suspect" classification would be applied, and that depriving her of a meaningful educational opportunity would be just the sort of denial of equal protection which has been held unconstitutional in cases involving discrimination based on race and illegitimacy. 218 N.W.2d at 446–47.

Although the present posture of this case does not require us to resolve this issue, we will say that depriving retarded children of all educational benefits would appear to warrant greater judicial scrutiny than that applied in *Rodriguez.* For these reasons, we believe that *Rodriguez* is not controlling in this case.

In any event, there may be no rational basis for providing education to most children and yet denying plaintiffs instruction from which they could possibly benefit. In *PARC* this court stated that all mentally retarded children would benefit from education, 343 F.Supp. 279, 296 (E.D.Pa.1972), and that such denial "established a colorable constitutional claim even under the less stringent rational basis test." *Id.* at 283 & n. 8, 295. An educational program must be assessed in terms of its capacity to equip a child with the tools needed in life. *See Wisconsin v. Yoder*, 406 U.S. 205, 222, 92 S. Ct. 1526, 32 L.Ed.2d 15 (1972). Placement of children with the intelligence of two year olds in a program which emphasizes skills such as reading and writing would seem inadequate for their needs. The harmful consequences of denying plaintiffs an adequate education is underscored by the fact that mentally retarded children have greater need for formal education since they are less likely than ordinary children to learn and to develop informally. Accordingly, we cannot conclude that plaintiffs' complaint lacks constitutional substance.[10]

We grant the motions of defendants Shapp and Packel to dismiss; we deny the motions of the other defendants.

9. For example, until the last two years, retarded children have been universally denied admittance into public schools in the United States. In addition, thirty-two states have had statutes providing for the sterilization of retarded individuals. O'Hara & Sanks, *Eugenic Sterilization*, 45 Geo.L.J. 30 (1956).

10. In the alternative, plaintiffs claim that by being required to attend school without being provided a *minimally adequate education*, they have been deprived of liberty without due process of law. Plaintiffs argue that since compulsory school attendance laws are justified by the state's interest in educating children, failing to provide a meaningful education reduces school to confinement and constitutes a serious infringement on a child's physical liberty. In making this argument, plaintiffs analogize to cases holding that mentally ill patients confined to hospitals and juveniles placed in reformatories are entitled to care and treatment in order to justify their confinement. *E. g., Donaldson v. O'Connor*, 493 F.2d 507, 519–21 (5th Cir. 1974), *vacated and remanded in part*, 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975); *Welsch v. Likins*, 373 F.Supp. 487, 491–99 (D.Minn. 1974); *Stachulak v. Coughlin*, 364 F.Supp. 686 (N.D.Ill.1973); *Morales v. Turman*, 364 F.Supp. 166, 175 (E.D.Tex.1973); *Inmates of Boys' Training School v. Affleck*, 346 F. Supp. 1354, 1364–65 (D.R.I.1972). Nevertheless, in view of our finding regarding plaintiffs' equal protection claim, we need not presently consider the soundness of applying the due process clause to a school's failure to provide a minimally adequate education to its students.