**Fred PROCHASKA, Plaintiff,**

v.

**John E. FEDIACZKO, John A. Meehan, Frank Vitril, Thomas A. Shumaker, Lawrence County Child Welfare Services, Defendants.**

Civ. A. No. 77–201.

United States District Court,
W. D. Pennsylvania.

July 12, 1979.

Anne Nelson, American Civil Liberties Union, Pittsburgh, Pa., Paul D. Boas, Pittsburgh, Pa., for plaintiff.

Alan A. Garfinkel, Charles Gibbons, Berkman, Ruslander, Pohl, Lieber & Engel, Pittsburgh, Pa., Michael D. Buchwach, Howard A. Specter, Litman, Litman, Harris & Specter, Pittsburgh, Pa., John Garbett, Keller, Luzenberg & Garbett, Elwood City, Pa., David Brakoniecki, Pittsburgh, Pa., John ViPond, Philadelphia, Pa., for defendants.

## MEMORANDUM AND ORDER

COHILL, District Judge.

### Facts

This action was filed by plaintiff, Fred Prochaska, as a result of his five-day suspension from the Lawrence County Child Welfare Services (CWS) payroll on February 25, 1977. While a caseworker at CWS plaintiff had been assigned to the case of Debra W., a juvenile, who was adjudged to

be an habitual truant and who was committed to Gannondale School for Girls, Erie, Pennsylvania, by Judge John Henderson, sitting in the juvenile court of Lawrence County. Plaintiff had been critical of that decision, believing that both the actions of his superiors at CWS and the court order were illegal and not in conformity with the Department of Public Welfare Regulations and the Juvenile Act of Pennsylvania. Suing under 42 U.S.C. §§ 1983 and 1985, plaintiff sought a temporary restraining order to prevent his suspension, which we refused after a hearing. Plaintiff avers that he was unlawfully suspended by defendants John Fediaczko, the CWS Administrator, and the three Lawrence County Commissioners, John A. Meehan, Thomas A. Shumaker and Frank A. Vitril.

We now have a Motion for Summary Judgment, submitted by defendant Frank Vitril on the ground that he was not personally involved in the suspension of the plaintiff, and therefore cannot be held liable for depriving plaintiff of his constitutional rights.

On February 24, 1977, plaintiff received a letter from the Commissioners, informing him of their approval of administrator Fediaczko's request for plaintiff's suspension for five days for insubordination. Defendants Meehan and Shumaker had met with plaintiff and Fediaczko on February 24, 1977, to discuss the matter, and only they had signed the letter.

Plaintiff claims that the actual reason for his suspension is contrary to the reasons set forth in the letter of suspension. He alleges that his suspension was authorized in retribution for his exercise of his First Amendment free speech rights and for his expressing his opinion as to the proper disposition of the case of Debra W.

Defendant Vitril assets that there are no material facts in dispute concerning his personal involvement in plaintiff's suspension. Vitril's list of uncontroverted facts in support of his motion includes:

1. Vitril was hospitalized from February 20, 1977 to February 24, 1977, and did not return to his office until February 28, 1977, the first day of plaintiff's five-day suspension.

2. The decision to suspend plaintiff was made at the February 24, 1977 meeting, at which plaintiff was present along with Commissioners Meehan and Shumaker only; since Vitril was not present, he did not vote nor participate in this decision.

3. Vitril had no contact with the other defendants at the time that the decision to suspend plaintiff occurred and did not consult with the other defendants about the decision to suspend plaintiff.

In light of these facts he argues that it is therefore uncontroverted that he was not in any way personally involved in the decision to suspend the plaintiff and, thus, he is entitled to a summary judgment as a matter of law.

Plaintiff concedes that defendant Vitril was absent from the February 24, 1977 meeting and that Vitril's signature does not appear on the Commissioners' letter of suspension addressed to plaintiff. Nevertheless, plaintiff argues that the question of Vitril's personal involvement in the suspension remains a disputable fact, arguing that Vitril mistakenly assumes that the decision to suspend actually and unquestionably occurred at the meeting of February 24, 1977, during the time of Vitril's hospitalization. Plaintiff avers that the decision to suspend him might have occurred—and in all probability did occur—prior to the defendant's hospitalization. Assuming *arguendo* that this is what happened, then the February 24 meeting may have been nothing more than a mere formality.

In his affidavit opposing the present motion, plaintiff claims that between February 15 and February 20, 1977, defendant Fediaczko approached plaintiff on at least two occasions and informed him that the decision to suspend him had already been made with the only issue remaining being the length of the suspension. Plaintiff further alleges that defendant Fediaczko informed him that some punishment would certainly be forthcoming due to the displeasure of the County Commissioners, including defendant Vitril, with the adverse publicity

generated by plaintiff. Moreover, plaintiff alleges that defendant Vitril "was clearly a part of this determination and sentiment as it had been expressed" to him on these two occasions which preceded Vitril's hospitalization. Plaintiff argues that Vitril's attitude was hostile at a meeting attended by plaintiff on January 24, 1977, in Vitril's office, where both defendants Meehan and Fediaczko were also present.

In his deposition, plaintiff recalled that Vitril had been emphatic that plaintiff should not question Judge Henderson's order concerning the Debra W. case. Plaintiff alleges that Vitril during this discussion "threatened me repeatedly with termination or suspension if I did not cease and desist from speaking out against the agency position." Plaintiff has claimed that at the January 24 meeting Vitril assumed the most vocal and active role, doing "over ninety percent of the talking." (Plaintiff's deposition, p. 48.)

The January 24, 1977 meeting was before plaintiff's alleged exercise of his First Amendment rights with members of the media and governmental agents, particularly the Pennsylvania Department of Justice and the Pennsylvania Office of Children and Youth. At the time of this meeting, Vitril alleges that he made no reference to the plaintiff's contact with such persons and agencies. However, in his affidavit, plaintiff specifically alleges that "all of the county commissioners were aware of my outspoken posture," and were aware of his subsequent contacts with the Department of Justice and the Division of Children and Youth, which purportedly took place prior to defendant Vitril's hospitalization.

## I.

### The § 1983 Claim

At the outset, we are constrained by Fed. R.Civ.P. 56 regarding motions for summary judgment. Rule 56(c) allows the granting of such a motion when there exists no genuine issue as to any material fact; ". . . the purpose of the rule is not to cut litigants off from the right of trial by jury if they really have issues to try." *Wursberg*

*Bros., Inc. v. Head Ski Co.*, 276 F.Supp. 142, 145, citing *Poller v. Columbian Broadcasting System, Inc.*, 368 U.S. 464, 467, 82 S.Ct. 486, 7 L.Ed.2d 468 (1962). Defendant Vitril argues that there are no facts in dispute concerning his personal involvement in the suspension of plaintiff. A review of the complaint, deposition and affidavits of plaintiff convinces us that to grant the motion at this juncture would sustain a factual illusion. In short, there remain several triable issues of fact which we are not willing to ignore and thus cannot summarily dismiss.

We agree that an essential element of a 42 U.S.C. § 1983 action requires that the personal involvement of the defendant in the deprivation of the plaintiff's constitutional rights be alleged. Moreover, such deprivation must have occurred while defendant acted under color of state law. *Downs v. Dept. of Public Welfare*, 368 F.Supp. 454, 563 (1973). Vitril argues that the court cannot infer any personal liability for the alleged unconstitutional deprivations since he was hospitalized at the time when the other defendants met with plaintiff on February 24, 1977 and at that time decided to suspend plaintiff. Also, Vitril points to the admitted fact that his signature was not appended to the letter of the Board of Commissioners, informing plaintiff of his suspension. Vitril concludes that the decision to suspend plaintiff could not have taken place any earlier than February 24, 1977, during his hospitalization, and thus, any deprivation complained of by plaintiff cannot be prior to this date. In light of plaintiff's allegations we are dissuaded from adopting this premature factual conclusion.

The question remains as to when plaintiff's rights were deprived and by whom, if, indeed, he did suffer the alleged deprivation. It is possible that the actual decision to suspend plaintiff does not correspond with the purported official time, *i. e.*, the February 24, 1977, meeting. Plaintiff alleges that it is probable that the decision to suspend him might have taken place

sometime between February 15 and February 20 as he supposedly learned from his two encounters with defendant Fediaczko. It is agreed that defendant Vitril had not yet been hospitalized at this time. He could have played an integral part in the Commissioners' ultimate action, according to plaintiff. The time of deprivation is a disputed, and thus triable, issue of fact.

■ In order to maintain a § 1983 action, "plaintiff must specifically allege a direct causal link between some official conduct of each Commonwealth defendant and the alleged constitutional deprivations." *Fialkowski v. Shapp*, 405 F.Supp. 946, 950 (1975). Plaintiff's allegations are sufficient to implicate defendant Vitril in depriving plaintiff of his rights while acting within his official capacity as a Lawrence County Commissioner. It is not argued by either side that defendant Vitril was not interested in the controversy surrounding plaintiff as evidenced by the January 24 meeting taking place in defendant Vitril's office. In light of this fact, and the allegation that defendant Vitril at the same meeting made repeated threats towards plaintiff about his speaking out against the agency position there exist ample disputed facts. In addition, it has been alleged that defendant Vitril's interest in plaintiff's position did not end at the close of the January meeting since Vitril was in contact with those who allegedly knew that plaintiff had discussed the matter with the Department of Justice and the Division of Children and Youth. (See plaintiff's affidavit.) Plaintiff argues partially that as a result of these discussions he was suspended from his employment and unconstitutionally deprived of his individual rights by the defendants, Vitril included.

■ Courts have been justifiably reluctant to impute liability to high level officials when a plaintiff "alleges nothing more than general knowledge plus a mere failure to act." ·*Fialkowski v. Shapp*, 405 F.Supp. 946, 952 (1975). The officials' mere failure to act in order to stop an alleged violation "does not constitute the kind of acquiescence necessary to sustain an action for damages for specific violation, at least in those cases where defendant official does not directly and closely supervise" his subordinates. *Ibid.* at 952. To sustain his actions under § 1983 a plaintiff "must usually allege that the defendant official participated in, approved of, or was present during the violation to satisfy the personal involvement requirement." *Ibid.* at 952–53. In *Fialkowski* the motions to dismiss submitted by defendants, two state government officials, were denied since it had been alleged that they had direct supervisory control over the policies of the local school district in providing mentally retarded children with appropriate education. Accordingly, there was sufficient cause to question the liability of these two defendants in *Fialkowski* after considering the "authority and responsibility" assumed by them as Secretary of Education and former Director of the Right to Education Office. The district court, following a review of the personal involvement issue in past disputes, concluded that "findings of general knowledge combined with direct supervisory control may be sufficient to hold an official personally involved in the unlawful acts of his subordinates." *Ibid.* at 951. These defendants, it was held, "could still be held liable . . . despite the fact that they did not know plaintiffs' names." *Ibid.* at 951.

Here, plaintiff's action against defendant Vitril is not based upon an alleged passive act of omission, but on the affirmative role Vitril assumed during and after the January 24, 1977 meeting. As a commissioner, it has been further alleged that Vitril had direct supervisory control over CWS and he certainly knew of plaintiff's adverse position and possessed knowledge of the entire matter. There is, in fact, a greater degree of intimacy in the instant case between plaintiff and defendant than that prevailing in *Fialkowski*. The anonymity of plaintiffs' names by defendants in *Fialkowski* is replaced by defendant's admitted familiarity with it here. Thus, following a review of the respective arguments and allegations made with respect to this motion, we are

not satisfied that defendant Vitril was either distantly remote or adequately ignorant to elude *Fialkowski's* "general knowledge—direct supervisory" test.

## II.

### *The § 1985(3) Claim*

Defendant Vitril has also moved to dismiss the 42 U.S.C. § 1985(3) claim as to him on the same general grounds as the § 1983 claim. At oral argument a defect in plaintiff's § 1985(3) claim was uncovered: the failure to allege membership in a class of persons against which the defendants had directed a class-based animus. The United States Supreme Court recently reconsidered the scope and purposes of § 1985(3) in *Great American Federal Savings & Loan Ass'n v. Novotny*, —— U.S. ——, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979). On the way to holding that § 1985(3) could not be invoked to redress alleged violations of Title VII of The Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, the Supreme Court stated "a plaintiff in an action under § 1985(c) must prove both a conspiracy and a group animus." at ——, 99 S.Ct. at 2352. *See also Griffin v. Breckenridge*, 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971). Although the "racial or, perhaps otherwise class-based, invidiously discriminatory animus" recognized by the *Griffin* court has not been fully defined, *Id.* at 102 and notes 9–10, 91 S.Ct. at 1798, the plaintiff here has alleged only a conspiracy directed toward him for individual exercise of First Amendment rights. We cannot conceive of a class of persons which would fit the requirements of § 1985(3) precedent among whom plaintiff claims protection. *See Pendrell v. Chatham College*, 370 F.Supp. 494 (W.D.Pa. 1974) (race and sex are classifications against which class-based animus may be directed); *Kimble v. D. J. McDuffy, Inc.*, 445 F.Supp. 269 (D.La.1978) (a class under § 1985(3) must have common characteristics of an inherent nature); *Askew v. Bloemaker*, 548 F.2d 673 (6th Cir. 1976) (class status must be independent of allegedly unconstitutional actions); *Western Telecasters, Inc. v. California Federation of Labor, AFL-*

*CIO*, 415 F.Supp. 30 (D.Cal.1976) (bias against non-union employees was not a class-based animus). As the Sixth Circuit noted in the *Askew* case, *supra*, the requirement of showing a broad discriminatory animus prevents § 1985(3) from becoming a general tort law for persons injured by groups of two or more.

All persons entitled to exercise of First Amendment rights—if considered as the class here—would necessarily include all citizens of the United States and therefore vitiate the class requirement of § 1985(3) as construed by the Supreme Court.

Therefore, defendant Vitril's motion to dismiss the § 1985(3) claim will be granted for plaintiff's failure to state a cause of action.

An appropriate order will be entered.