Gerald BIBY, Plaintiff,

v.

BOARD OF REGENTS OF THE UNI-
VERSITY OF NEBRASKA AT LIN-
COLN, Darrell W. Nelson, Donald
Helmuth, Richard Wood, Ken Cauble,
and John Does 1–8 In Their Individual
Capacities, Defendants.

No. 4:03CV3206.

United States District Court,
D. Nebraska.

Sept. 29, 2004.

Mary C. Gaines, Ballew, Schneider Law Firm, Lincoln, NE, for Plaintiff.

Terry C. Dougherty, Woods, Aitken Law Firm, John C. Wiltse, Lincoln, NE, for Defendant.

## MEMORANDUM AND ORDER

BATAILLON, District Judge.

### INTRODUCTION

Before me are the defendants' motion, Filing No. 17, for summary judgment.[1] The motion is supported by briefs, Filing Nos. 18 and 32, and indices of evidence, Filing Nos. 20 and 33. The plaintiff filed a responsive brief, Filing No. 27, and an index of evidence, Filing No. 29. Having carefully reviewed the record and the applicable law, I conclude that the defendants' motion should be granted in part and denied in part.

Gerald Biby, the plaintiff, is a former employee of the University of Nebraska–Lincoln who worked for the Industrial Agricultural Products Center (IAPC). He is suing the University's Board of Regents (University) and several University employees over the termination of his employment. The second amended complaint[2] lists ten causes of action brought under federal and state law.[3] As reme-

---

1. The defendants also move for a hearing on the motion for summary judgment. Filing No. 19. This motion is denied. See NECivR 7.1(d) and 56.1.

2. In the first amended complaint, Filing No. 8, the plaintiff also brought suit against the defendants in their official capacities. However, the plaintiff moved to dismiss causes of action I through V against the Board of Regents and the individual defendants in their official capacities, Filing No. 25, and the court granted the motion, Filing No. 30.

3. Those causes of action are: 1) an alleged Fourth Amendment violation of privacy, brought pursuant to 42 U.S.C. § 1983; 2) an alleged First Amendment violation of free speech, brought pursuant to 42 U.S.C. § 1983; 3) an alleged Fifth Amendment denial of due process, brought pursuant to 42 U.S.C. § 1983; 4) an alleged conspiracy to violate the plaintiff's constitutional rights, brought pursuant to 42 U.S.C. § 1985; 5) an alleged conspiracy to impede, hinder, obstruct, or defeat the due course of justice, brought pursuant to 42 U.S.C. § 1985; 6) an alleged violation of the Nebraska State Government Effectiveness Act, Neb.Rev.Stat. § 81–2701 et seq.; 7) an alleged deprivation of the plaintiff's constitutional and statutory rights, secured by Neb.Rev.Stat. § 20–148; 8) an alleged tortious interference with a busi-

dies, Biby asks for lost wages and benefits, past and future royalties, patent rights, punitive and compensatory damages, costs, and attorney's fees.

## LEGAL STANDARD

On a motion for summary judgment, the question before the court is whether the record, when viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Mansker v. TMG Life Ins. Co.*, 54 F.3d 1322, 1326 (8th Cir.1995). Where unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate. *Id.*

The burden of establishing the nonexistence of any genuine issue of material fact is on the moving party. Fed.R.Civ.P. 56(c); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Once the movant meets the initial burden of showing there is no genuine issue of material fact, the party opposing the motion may not rest upon the allegations in the pleadings but rather must set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists. *See* Fed. R.Civ.P. 56(e); *Chism v. W.R. Grace & Co.*, 158 F.3d 988, 990 (8th Cir.1998). The party opposing the motion may not simply suggest some metaphysical doubt as to the material facts; rather, the party must present evidence sufficient to support a jury verdict in that party's favor. *Id.* Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to estab-

lish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In ruling on a motion for summary judgment, a court must not weigh evidence or make credibility determinations. *Kenney v. Swift Transp. Co.*, 347 F.3d 1041, 1044 (8th Cir.2003).

## FACTUAL BACKGROUND

The University hired Biby in 1993 as a technical assistance coordinator for the IAPC. The mission of the IAPC is to increase non-food and industrial uses of agricultural products. Biby's position was non-tenured, classified as managerial-professional. He had his own office and his own computer, provided and supported by the University. The director of the IAPC was Milford Hanna, Ph. D.

One of the projects Biby worked on with Drs. Hanna and Qi Fang was the development of horticultural applications for polylactic acid (PLA). They modified the PLA technology for use in biodegradable printable plastics, calling it Soft Touch II, and offered the invention to the University on March 7, 1997. Filing No. 28, Pl.'s Index of Evid., Ex. 4. The three also applied for a provisional patent later in March 1997, naming themselves the owners of the patent.[4] Defendant Donald Helmuth, Ph. D., the Associate Vice Chancellor for Research at the University, contends that the University accepted the invention by filing with the Patent and Trademark Office a "Verified Statement (Declaration) Claiming Small Entity Status (37 C.F.R. 1.9(f)

---

ness relationship; and 9) an alleged breach of a third-party beneficiary contract. *See* Filing No. 49. The plaintiff has dismissed the tenth cause of action, which claimed a violation of the Nebraska Fair Employment Practices Act. Filing No. 91.

4. The PTO acknowledged the receipt of the application. Filing No. 28, Pl.'s Index of Evid., Ex. 5.

and 1.27(d))—Nonprofit Organization" which stated "rights under contract or law have been conveyed to and remain with the nonprofit organization with regard to the invention." Filing No. 20, Defs.' Index of Evid., Ex. 1, Helmuth Aff., ¶ 2; Ex. 1.1 at 1. However, the record does not contain a formal acceptance or rejection of the offer of invention. The plaintiff maintains that the University did not accept the invention, in contravention of University patent policy,[5] and hence could not claim ownership of the invention in subsequent licensing agreements.[6]

In July 1997, the University and Corn Card International (CCI) entered into a technology licensing agreement (TLA) granting CCI a license to use the PLA technology described in the provisional patent application. *See id.,* Ex. 1.2. The TLA stated that the University owned the PLA technology, *id.* at 1, and gave CCI exclusive rights within the United States, Mexico, and Canada to use the patented technology "to develop, market and sell" licensed products. *Id.* at 2, art. 2. The TLA required the parties to submit disputes arising out of the TLA to arbitra-

tion. *Id.* at 6, art. 12. In reliance on the TLA, CCI allegedly expended significant capital to market and develop "the corn resin product trademarked by Corn Card known as 'Mazin R.'" *Id.,* Ex. 1.3 at 1. In particular, CCI sought to negotiate a sublicensing agreement with a company called Gemplus, an international manufacturer of biodegradable plastic cards. *Id.* at 1–2. The plaintiff asserts that he kept the defendants fully informed of all his negotiations with CCI and Gemplus and that none of the defendants ever opposed the negotiations. Filing No. 28, Pl.'s Index of Evid., Ex. 1, Biby Aff., ¶¶ 6, 16, 18, 21, and 25.

A dispute subsequently arose between the University and CCI, the exact nature of which is not entirely clear from the record.[7] The dispute between the University and CCI was scheduled for arbitration in late summer 1999. Filing No. 20, Defs.' Index of Evid., Ex. 1, Helmuth Aff., Ex. 1.6. In preparation for the arbitration, the University told Biby to turn over copies of all his documentation and other information on CCI. The plaintiff contends that he did as he was asked, turning over more than 900 pages of materials, but that he

---

5. The University's patent policy provides in part that staff members' patentable discoveries

result[ing] from the performance of duties owed to the University, or from the use of University properties or facilities ... shall be offered to the University in writing prior to making a patent application. If the University accepts the offer within six months, it shall pursue the patent application with the help of the inventor at no cost to the latter.... If the Board [of Regents] rejects the offer, the inventor is free to pursue the patent application at his or her own expense.... The President, or any administrative officers designated by the President, shall have authority to accept or reject patentable discoveries offered to the University as required by this section and the Board's patent procedures policy.

Filing No. 20, Defs.' Index of Evid., Ex. 2, Robak Aff., Ex. 2.1, ¶ 3.10.

6. Biby also alleges that nearly two years later, he and Drs. Hanna and Fang assigned the Touch II patent to the University in April 1999 "[b]ecause of the [University's] intimidation and coercion." Filing No. 28, Pl.'s Index of Evid., Ex. 1, Biby Aff. at 4, ¶ 11. This assignment does not appear in the record.

7. The complaint alleges that the dispute arose because the defendants "may have breached the agreement with Corn Card by promising the use of the technology to another company and by failing to have proper ownership at the time the TLA was entered into." Filing No. 49, Second Amended Complaint at 3, ¶ 11. That other company was apparently Cargill. Filing No. 20, Defs.' Index of Evid., Ex. 3, Nelson Aff., Ex. 3.1.

came to believe the University was attempting "to subvert the litigation process by failing to make certain information known to Corn Card or its attorneys." Filing No. 49, Amended Complaint at 3, ¶ 12. *See also* Filing No. 28, Pl.'s Index of Evid., Ex. 1, Biby Aff., ¶¶ 20–26. The plaintiff acknowledges that he publicly stated on more than one occasion his belief that the University had breached the agreement with CCI. Filing No. 49, Amended Complaint at 3, ¶ 12.

Because he believed the plaintiff had exceeded his authority in dealing with CCI, Dr. Helmuth in January 1999 told the plaintiff "to cease communications with CCI and Gemplus and direct any inquiries to the law firm" the University had hired to handle the dispute. Filing No. 20, Defs.' Index of Evid., Ex. 1, Helmuth Aff. at 2, ¶ 4. Dr. Helmuth twice repeated the prohibition on communicating with CCI and Gemplus in February 1999. *Id.*, Exs. 1.4 and 1.5. Defendant Darrell Nelson, Ph. D., the Dean and Director of the Agricultural Research Division of the University's Institute of Agriculture and Natural Resources, repeated the warning in March 1999. *Id.*, Ex. 3, Nelson Aff., at 2, ¶ 5. His letter stated, "CornCard International has instituted legal action against the University of Nebraska and all contact with Corn-Card International and Bill Brown [president of CCI] must be through University legal counsel." *Id.*, Ex. 3.1.

In May 1999, the University and CCI agreed to exchange all non-privileged documents by no later than June 10, 1999. *Id.*, Helmuth Aff. at 3, ¶ 5; Ex. 1.6. On June 2, Dr. Helmuth telephoned Biby to inform him that the University was going to search his computer files and that as a matter of University policy, Biby would need to sign a consent to search form. According to Dr. Helmuth, University policy required a University police officer to witness Biby's signature as proof the signature was not coerced. *Id.*, Ex. 5, Drew Aff., Ex. 5.1 (taped telephone conversation between the plaintiff and Helmuth).[8] Dr. Helmuth faxed Biby a University executive memorandum about this policy at Biby's request. *See* Filing No. 28, Pl.'s Index of Evid., Ex. 17, "Executive Memorandum No. 16"; Ex. 1, Biby Aff. at 13, ¶ 34. The plaintiff now asserts that the first time he ever saw the defendants' version of this executive memorandum, Filing No. 20, Defs.' Index of Evid., Ex. 2, Robak Aff., Ex. 2.2, "Executive Memorandum No. 16," was as part of the index of evidence filed in support of the motion for summary judgment. The two documents differ considerably.[9]

---

8. This exhibit is a VHS tape apparently prepared as part of Biby's second grievance against the University. The defendants have designated the contents of the tape from its beginning at 00:00 to 55:05. *See* Filing No. 20, Defs.' Index of Evid. at 3, ¶ 5.

9. The policy offered by the plaintiff stated that a user's files and data were private information unless the user revealed the file or data to others. It also provided that when a "legitimate University reason exists … a duly authorized University official, who must have a legitimate need to know the information," could access the user's files and data. Searches of a user's files and data "will only be made when a legitimate University reason exists," including, *inter alia*, investigation of improper or illegal uses if the use is reasonably suspected to be for unauthorized personal gain or a "[r]esponse to a public records request, administrative or judicial order or request for discovery in the course of litigation." Filing No. 28, Ex. 17, ¶ 5. The policy does not appear to mention consent to search forms or the requirement that such forms be signed in a police officer's presence. However, a June 1 memorandum from defendant Ken Cauble, who was then the University's Chief of Police, stated that "our internal policy on the use of Consent to Search forms is that the rights of individuals can only be waived to a commissioned member of our Department." *Id.* at 1. This policy "insure[s][sic] there is no undue pressure to waive the rights, no threats or promises of an

The following morning, Anthony Spulak, a community service officer with the University Police Department who performed computer support work for the department, accompanied by a plainclothes University police officer, went to the plaintiff's office to search his computer files. The plaintiff videotaped this encounter. Filing No. 20, Defs.' Index of Evid., Ex. 5, Drew Aff., Ex. 5.1. Spulak told the plaintiff he was there to look for computer files the plaintiff may have forgotten or missed when he had earlier gathered the CCI documents, but that he would not search the plaintiff's files unless the plaintiff signed the consent to search form held by the police officer. Biby refused. Spulak and the officer left.

On the afternoon of June 3, Biby taped a telephone conversation he had with Drs. Hanna, Helmuth, and Nelson about the consent to search form. Dr. Helmuth attempted to reassure Biby that he had no evidence that Biby had done anything illegal, so signing the consent should not concern Biby. Helmuth told the plaintiff that all files concerning CCI, including those which concerned Gemplus and Cargill, had to be turned over the University and that Spulak was there to go through the files with the plaintiff to make sure everything was collected. *Id.*

On June 4, Chief Cauble told Spulak that defendant Richard Wood, general counsel for the University, had decided that because the University owned the computer, the University did not need Biby's consent to search it. *Id.*, Ex. 6,

Spulak Aff. at 3, ¶ 5. On Cauble's order, Spulak returned to the plaintiff's office, this time accompanied by a uniformed University police officer. The plaintiff also videotaped part of this encounter.[10] *Id.*, Ex. 5, Drew Aff., Ex. 5.1. Spulak informed Biby that he would close without copying any file of a personal nature, but that he would read and copy all files pertaining to CCI. Biby apparently acceded to the search by saying, "You can start if you want." *Id.* Biby entered his password and Spulak then reviewed the files located by a search using key words related to the arbitration.[11] *Id.*, Ex. 6, Spulak Aff. at 4–5, ¶¶ 8–9.

Before CCI and the University arbitrated their dispute, CCI filed suit in state court against the University.

The plaintiff filed a grievance against the University on July 21, 1999, protesting the search of his computer.[12] On the same day, he was deposed in connection with CCI's suit against the University; a second deposition occurred on August 13, 1999. The defendants contend that between the two depositions, the plaintiff had at least two contacts with CCI president Bill Brown about the dispute between CCI and the University. The defendants also contend that the plaintiff gave CCI documents and audiotapes after the University had ordered him to not have contact with CCI. *Id.*, Ex. 3, Nelson Aff. at 4, ¶ 7; Ex. 3.3.

On September 23, Dr. Nelson placed Biby on paid administrative leave for "ex-

inappropriate nature being made that results in the waiving of the rights by any individual." *Id.* The officer's presence "insure[s][sic] there is full understanding by the individual of what they are doing by signing the document." *Id.*

**10.** Spulak believes that the search lasted longer than the videotape shows. Filing No. 20, Ex. 6, Spulak Aff. at 6, ¶ 11.

**11.** When Biby became ill during the search, Spulak concluded the search by sending to his own e-mail address Biby's Pegasus e-mails, none of which Spulak had yet reviewed.

**12.** According to Biby, the grievance committee found in his favor, but the University did not adopt the committee's recommendations and did not allow Biby to resume his duties. Filing No. 49, Amended Complaint at 4, ¶ 16.

ceed[ing] his authority under the contract policy and disobey[ing] instructions not to contact CCI directly." *Id.* at 3, ¶ 8. *See also id.,* Ex. 3.4. After meeting with Biby on October 12, 1999, to discuss the grounds for placing him on leave, Dr. Nelson decided to terminate Biby's employment. Dr. Nelson informed Biby of his decision by letter dated November 8, 1999. *Id.* at 4, ¶¶ 9–10. Biby subsequently filed a grievance over his termination.

## DISCUSSION

The defendants argue that they are entitled to summary judgment for numerous reasons.

A. *State's Sovereign Immunity.* Because the plaintiff has dismissed counts I through V against the Board of Regents and the individual defendants in their official capacities, the sovereign immunity issues raised by those counts are moot.

B. *Qualified Immunity Under Section 1983.* The law imposes civil liability on any person who "under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. The defendants in their individual capacities claim that they cannot be held liable under this statute because the doctrine of qualified immunity "shields government officials from suit unless their conduct violated a clearly established constitutional or statutory right of which a reasonable person would have known." *Yowell v. Combs,* 89 F.3d 542, 544 (8th Cir.1996). "The Supreme Court has generously construed qualified immunity protection to shield 'all but the plainly incompetent or those who knowingly violate the law.'" *Davis v. Hall,* 375 F.3d 703, 711–12 (8th Cir.2004) (*quoting Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)).

To survive a motion for summary judgment based on the defense of qualified immunity, the plaintiff must, first, establish facts that, when taken in the light most favorable to the plaintiff, show that the defendants' conduct violated a constitutional right. *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). If the plaintiff makes this showing, the plaintiff must also establish that "the constitutional right was clearly established in light of the specific context of the case." *Kuha v. City of Minnetonka,* 365 F.3d 590, 601 (8th Cir.2003) (as amended). A right is clearly established if " 'a reasonable official would understand that what he is doing violates that right.' " *Buckley v. Rogerson,* 133 F.3d 1125, 1128 (8th Cir.1998) (*quoting Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). The inquiry is "fact-intensive and 'must be undertaken in light of the specific context of the case, not as a broad general proposition.' " *Davis v. Hall,* 375 F.3d at 712 (*quoting Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151 (2001)).

### 1. *First Cause of Action: Fourth Amendment Privacy.*

Biby alleges that the search of the computer in his University office violated his Fourth Amendment right to privacy. He claims a reasonable expectation of privacy in the confiscated information that was based, in part, on "the circumstances surrounding his employment, the nature of his employment, and the policy providing a clear expectation of privacy absent specific circumstances." Filing No. 49, Second Amended Complaint at 4, ¶ 21.

The defendants argue that in the circumstances of this case, the plaintiff's Fourth Amendment cause of action must fail for several reasons. First, the University's search of the computer for work-related materials violated no clearly established right. The defendants contend that

the Fourth Amendment warrant or probable cause standard does not apply when a government employer such as the University searches an employee's files to recover government property or to investigate misconduct. Further, they argue that the applicable University policy provided that employees should not expect their computer files to be private. Finally, the defendants argue that the plaintiff consented to the search of the computer, voluntarily and without coercion, even to the point of volunteering his computer password. Under these circumstances, the defendants contend, the defendants did not violate a clearly established right of the plaintiff under the Fourth Amendment.

The plaintiff responds that at the time the search occurred, he had a constitutionally protected expectation of privacy in his office and files. Although the plaintiff maintains that he had not seen prior to this litigation the exhibit identified as the University's computer policy, he would dispute any interpretation of that policy that would deny privacy protection for University employees' computer files. Further, the plaintiff insists that the University had no evidence that he was engaged in misconduct that might have otherwise justified the search. The plaintiff notes that a search was unnecessary because he had already turned over the documents and information the University sought and would have provided any other information required. Moreover, he contends that any "consent" to search he might have given was coerced and that in any event, the search was unreasonably broad in scope. Since the defendants were aware of the plaintiff's privacy rights and that a nonconsensual search could violate those rights, the plaintiff contends that the defendants are not entitled to a qualified immunity defense.

■ I agree with the defendants that Biby has failed to support his argument that the University has violated a clearly established constitutional right. I further find that a reasonable official would not have believed his conduct to be unlawful and that the scope of the search was reasonable. The University conducted the search primarily to provide documentation related to a lawsuit and ensuing arbitration. The search is, therefore, justified as it related to a work purpose. The computer policy offered by the plaintiff states that when a "legitimate University reason exists . . . a duly authorized University official, who must have a legitimate need to know the information," can access the user's files and data. The policy further provides that searches of a user's files and data "will only be made when a legitimate University reason exists," including, *inter alia,* investigation of improper or illegal uses if the use is reasonably suspected to be for unauthorized personal gain or a "[r]esponse to a public records request, administrative or judicial order or request for discovery in the course of litigation." Filing No. 28, Ex. 17, ¶ 5. I find that the lawsuit and arbitration constitute a legitimate University reason.

Further, the evidence presented to date demonstrates that at the time of the search, the University suspected Biby had both exceeded his authority with respect to technology transfer contracts and violated the orders of Drs. Nelson and Helmuth forbidding pre-arbitration contact with CCI. It also demonstrates that at the time of the search, Biby had turned over more than 970 pages of information about CCI but had withheld materials dealing with Gemplus as well as personal files. Biby withheld these materials, despite the legitimate order from Dr. Nelson to turn over all materials in preparation for arbitration, because Biby feared Dr. Helmuth's Technology Transfer Office would "compromise" the documents' integrity in connection with the arbitration. *See* Filing No.

20, Ex. 5, Drew Aff., Ex. 5.1. Given this, it would appear that the University reasonably believed that it had a legitimate reason to search the plaintiff's computer and paper files for materials it had requested in connection with the CCI arbitration. The evidence indicates that the University was not interested in searching all of Biby's files and computer data, but rather only those dealing with the CCI arbitration.

Based on the foregoing facts, I conclude that the University did not violate a clearly established constitutional right. I further conclude that a reasonable official would not have concluded that the conduct was unlawful. For these reasons, I find that the defendants are entitled to qualified immunity as to this cause of action.

### 2. *Second Cause of Action: First Amendment*

The plaintiff alleges that the defendants retaliated against him because he spoke out "about his concerns that the Defendants' conduct may be unlawful." Filing No. 49, Second Amended Complaint at 5, ¶ 26. The plaintiff alleges that he "did iterate on more than one occasion that he believed the University may be in breach of its agreement with Corn Card. Plaintiff continually had concerns that the Defendants were engaging in intentional actions contrary to the agreement with Corn Card." *Id.* at 3, ¶ 12. The plaintiff contends that his speech on the matter was protected activity. The defendants contend, however, that the plaintiff was terminated not because of his speech but because he "fail[ed] to follow University rules on contract authority and because he disobeyed directives not to communicate directly with CCI once it became apparent that the legal interests of the University and CCI were at odds." Filing No. 17, Defs.' Brief at 29.

"It is clearly established that a State may not discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech." *Rankin v. McPherson,* 483 U.S. 378, 383, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987). A court asked to decide in a section 1983 action if an employee's free speech rights are "clearly established" at the time of the employee's discharge must first determine if the First Amendment protected the speech. *Kincade v. Blue Springs,* 64 F.3d 389, 395 (8th Cir.1995). Speech is protected if it "can be fairly characterized as constituting 'speech on a matter of public concern.'" *Id.* (*quoting Connick v. Myers,* 461 U.S. 138, 147–48, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983)). Whether speech is a public concern depends on the content, form, and context of the statement, as revealed by the record. *Connick v. Myers,* 461 U.S. at 147–48, 103 S.Ct. 1684. If the speech is on a matter of public concern, the court then balances the employee's right to free speech against the public employer's interests. *Pickering v. Board of Educ.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).

The defendants argue that the plaintiff's concerns about a possible breach of contract by his then-employer do not rise to the level of public concern, citing *Dover Elevator Co. v. Arkansas St. Univ.,* 64 F.3d 442, 446 (8th Cir.1995) (holding that a simple breach of contract is not a constitutional deprivation). However, the plaintiff is not himself asserting a breach of contract claim against the University. Instead, he is alleging that he was fired for "blowing the whistle" on the University for its allegedly questionable or unlawful methods of handling intellectual property—methods that the plaintiff alleges led to CCI's breach of contract lawsuit against the University. The record shows that following the search of his computer, the plaintiff wrote detailed letters and e-mails to the Nebraska State Ombudsman and a state senator about his concerns. Filing

No. 28, Pl.'s Index of Evid., Biby Aff. at 15, ¶¶ 41, 43, 48, 49.[13] Taking these facts in a light most favorable to the plaintiff, the content, context, and form of the plaintiff's statements thus suggest that the plaintiff's statements were about a matter of public concern.

The second step of the analysis is more difficult. If, as the plaintiff alleges, he was terminated for engaging in protected speech, the plaintiff's interests "as a citizen, commenting on matters of public concern," then must be balanced against the defendants' interests, as a public employer, "in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568, 88 S.Ct. 1731. The *Pickering* balancing test, however, appears weighted in favor of the public employer who maintains that the employee's free speech right was not "clearly established" for purposes of section 1983. The Eighth Circuit has held that "when *Pickering's* fact-intensive balancing test is at issue, the asserted First Amendment right 'can hardly be considered "clearly established" for purposes of the [ ] qualified immunity standard.'" *Grantham v. Trickey*, 21 F.3d 289, 293 (8th Cir.1994) (*quoting Buzek v. County of Saunders*, 972 F.2d 992, 997 (8th Cir. 1992)).

The post-*Pickering* qualified immunity defense is broad, "provid[ing] ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). Under this evolved qualified immunity standard, "the employer's justification for the discipline must be taken into account in determining whether the defendants' conduct was objectively unreasonable, that is, whether 'no reasonably competent officer would have concluded' that the discipline could be imposed without violating the employee's First Amendment rights." *Bartlett v. Fisher*, 972 F.2d 911, 916–17 (8th Cir.1992). The critical inquiry in determining if the free speech right is clearly established is "whether the defendants have put the *Pickering* balancing test at issue by producing evidence that the speech activity had an adverse effect on the efficiency of the public employer's operation." *Grantham*, 21 F.3d at 294. According to the Eighth Circuit, a public employee's exercise of free speech affects the efficiency of the public employer's service "when it affects the morale of the work force and damages the program's reputation." *Bartlett*, 972 F.2d at 917.

Here, the evidence is inconclusive on whether the plaintiff's speech affected the morale of the work force or damaged the program's reputation, particularly since the plaintiff contends that it was the defendants' dealings which negatively affected the morale and reputation of the IAPC. Filing No. 28, Pl.'s Index of Evid., Ex. 1, Biby Aff. at 8–9, ¶¶ 25, 26. The defendants' evidence suggests that the plaintiff was terminated for his disobedient, disruptive, and disloyal conduct throughout the CCI affair, but this characterization of the plaintiff stands in contrast to the plaintiff's pre-termination performance evaluations as "Excellent or Outstanding." *Id.* at 17, ¶ 46. The plaintiff's evidence presents him as a valued employee whose concerns about the defendants' handling of intellectual property put him in conflict with his superiors and drove him to jeopardize his

---

**13.** Before the search of his computer, the plaintiff alleges that he also contacted a local television station, but the plaintiff states that he declined to follow though with an interview because he feared retaliation. Filing No. 28, Pl.'s Index of Evid., Ex. 1, Biby Aff. at 12, ¶ 32. In addition, the plaintiff also contacted the governor and the Board of Regents following his termination. *Id.* at 18, ¶¶ 51, 52.

position at the IAPC by becoming a whistle blower.

■ Despite the Eighth Circuit's pronouncement's about the breadth of the qualified immunity defense, the court finds that the conflicting evidence in the record thus far creates genuine issues about whether the defendants' conduct was objectively unreasonable. The "fact-intensive" *Pickering* balancing test is therefore more appropriately left to the jury, who must decide if the plaintiff's First Amendment rights were "clearly established" at the time of his termination. Accordingly, the defendants' motion for summary judgment on the First Amendment grounds is denied.

### 3. *Third Cause of Action—Procedural Due Process*

The plaintiff alleges that the defendants deprived him of Soft Touch II patent royalties and other economic and incidental benefits without due process of law. Filing No. 49, Second Amended Complaint at 5, ¶ 30. The defendants contend that they are entitled to summary judgment because the plaintiff cannot establish that he had "a property interest in the patent, the TLA, or a legitimate expectation of continued employment." [14] Filing No. 17, Defs.' Brief at 30.

■ *Patent.* A genuine issue of material fact exists with regard to the surrender of the plaintiff's patent rights. Dr. Helmuth avers that the University accepted the plaintiff's "Offer of Invention" by filing a provisional patent application that was accompanied by a form stating that all rights to the invention had been conveyed to the University. Filing No. 20, Defs.' Index of Evid., Ex. 1, Helmuth Aff. at 1–2, ¶ 2. The

plaintiff contends, however, that the University did not accept the offer of invention within the six months required by the University's patent policy. *See id.*, Ex. 2, Robak Aff, Ex. 2.1. Instead, he asserts, he was coerced two years later into assigning to the University, without consideration, all his patent rights. Filing No. 28, Pl.'s Index of Evid., Ex. 1, Biby Aff. at 3–4, ¶¶ 10, 11.

A close examination of the record does not reveal an offer of acceptance or a provisional patent application, but only the form, signed by Helmuth, asserting that the University had rights to the patent. The omission of documentation conclusively establishing ownership of the patent is significant from the plaintiff's perspective, since under the University's patent policy, an inventor such as the plaintiff is entitled to at least fifteen percent of the net revenues from the patent. Filing No. 20, Defs.' Index of Evid., Ex. 1, Helmuth Aff. at 1–2, ¶ 2.

The defendants respond, however, that the plaintiff's claim must fail for a strictly procedural reason. Regardless of whether the plaintiff believed he had been coerced into assigning his patent rights to the University, the plaintiff knew that the assignment on April 16, 1999, meant that he was no longer the owner of the patent. Any challenge to the patent's ownership, however, raises a question of state law. *Omaha Cold Storage Terminals, Inc. v. Cunningham*, 1 U.S.P.Q. 1591, 1986 WL 15548 (N.D.Iowa 1986). The defendants therefore contend that any potential challenge to the assignment is subject to Nebraska's statute of limitations. The defendants maintain that the correct statute of limita-

---

14. The plaintiff has not alleged in the second amended complaint that the defendants violated his due process rights in continued employment. *See* Filing No. 49, Second Amended Complaint at 5. For that reason, the court

declines to address the arguments on that point raised in the defendants' summary judgment briefs. *See* Filing No. 18, Defs.' SJ Brief at 31; Filing No. 32, Defs.' SJ Reply Brief at 6–7.

tions is the four-year period for personal injury found in Neb.Rev.Stat. § 25–207(3), since "[s]ection 1983 claims are governed by the personal injury statute of limitations of the state where the claim arose." *Bridgeman v. Nebraska St. Pen.*, 849 F.2d 1076, 1077 (8th Cir.1988) (*citing Wilson v. Garcia*, 471 U.S. 261, 277–80, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985)).

The plaintiff filed this action on June 6, 2003, just missing the four-year statute of limitations. As a consequence, the court must grant the defendants' motion for summary judgment on the plaintiff's due process claim for deprivation of property rights in connection with the patent.

■ *TLA.* The defendants claim that they are entitled to summary judgment on any claim that the plaintiff is owed royalties or other benefits under the TLA with CCI because 1) the plaintiff was not a party to the TLA, and 2) the TLA does not provide for royalty payments to the plaintiff. The court agrees. According to the University's patent policy, any compensation the plaintiff might have received from the Soft Touch II technology would have derived from the net royalties generated under the patent, not directly from this particular TLA with CCI. The defendants' motion for summary judgment on this point is therefore granted.

#### 4. *Fourth Cause of Action: Conspiracy to Violate Plaintiff's Civil Rights (Section 1985(3)).*

■ The plaintiff alleges that the defendants' actions constitute a conspiracy to deprive him of his constitutional rights secured by 42 U.S.C. § 1985. To state a claim under 42 U.S.C. § 1985(3), a plaintiff must plead 1) the existence of a conspiracy; 2) a purpose of depriving a person or class of persons of equal protection of the laws; 3) an act in furtherance of the alleged conspiracy; and 4) an injury to person or property or the deprivation of a right or privilege granted to a United States citizen. *Wirth v. College of the Ozarks*, 26 F.Supp.2d 1185, 1188 (W.D.Mo. 1998), *aff'd*, 208 F.3d 219, 2000 WL 261132 (8th Cir.2000). Additionally, a plaintiff must show "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirator's action." *Id. See also Federer v. Gephardt*, 363 F.3d 754, 759 (8th Cir.2004) (a claim under the equal protection section of section 1985(3) requires proof of class-based animus). The plaintiff must also allege that an independent federal right has been infringed. *See Federer v. Gephardt*, 363 F.3d at 758 ("Section 1985 is a statute which provides a remedy, but it grants no substantive stand-alone rights. The source of the rights or laws violated must be found elsewhere.") Moreover, where the plaintiff alleges that a First Amendment right has been infringed, as in the present case, the plaintiff must prove that "the state is involved in the conspiracy or that the aim of the conspiracy is to influence the activity of the state." *United Broth. of Carpenters & Joiners of America v. Scott*, 463 U.S. 825, 830, 103 S.Ct. 3352, 77 L.Ed.2d 1049 (1983), *reh'g denied*, 464 U.S. 875, 104 S.Ct. 211, 78 L.Ed.2d 186 (1983).

■ The issue that the parties briefed and, therefore, appear to dispute is whether the plaintiff is a member of a "class" under 42 U.S.C. § 1985(3). The plaintiff contends that "individual[s] exercising their First Amendment rights qualify as class-based for the purpose of an action under § 1985(3)." Filing No. 27, Pl.'s Brief at 23. The court disagrees. In section 1985(3) actions premised on alleged First Amendment violations, prior courts have differentiated between persons suing as individuals and persons suing as members of a class. While members of a class may state a cause of action under section 1985(3) for any alleged infringement of a First Amendment right, *see United Broth-*

*erhood of Carpenters,* 463 U.S. at 833, 103 S.Ct. 3352, individuals who are not members of a class are precluded from maintaining any such action. *Prochaska v. Fediaczko,* 473 F.Supp. 704, 709 (W.D.Pa. 1979).

Although not binding authority, the court's reasoning in *Prochaska* is instructive. The plaintiff, a caseworker, was suspended from his job for criticizing his supervisor and the juvenile court in their disposition of a juvenile's case. *Id.* at 705. The plaintiff subsequently filed an action under 42 U.S.C. §§ 1983 and 1985 seeking a restraining order to prevent his suspension, which he alleged was in retaliation for the exercise of his First Amendment rights. The court granted the defendant's motion to dismiss, stating,

> At oral argument a defect in plaintiff's [section] 1985(3) claim was uncovered: the failure to allege membership in a class of persons against which the defendants had directed a class-based animus.... [T]he plaintiff here has alleged only a conspiracy directed toward him for individual exercise of First Amendment rights. We cannot conceive of a class of persons which would fit the requirements of [section] 1985(3) precedent among whom plaintiff claims protection.

*Id.* at 709. *See also Eggleston v. Prince Edward Volunteer Rescue Squad, Inc.,* 569 F.Supp. 1344, 1352 (E.D.Va.1983), *aff'd,* 742 F.2d 1448 (4th Cir.1984) ("people who exercise free speech and who petition the government for redress of their grievances are not in a class distinguishable from their fellow citizens and therefore are not within the realm of classes protected by § 1985(3)").

Like the plaintiff in *Prochaska,* the plaintiff in the present case has merely alleged a conspiracy directed at him for the individual exercise of his First Amendment rights. The plaintiff cannot establish membership in a class against which the defendants directed a class-based animus. Accordingly, the court finds that plaintiff is unable to state a claim for relief under 42 U.S.C. § 1985(3) and defendants' motion for summary judgment as to this cause of action is granted.

### 5. Fifth Cause of Action: Conspiracy to Violate the Plaintiff's Civil Rights (Section 1985(2))

The plaintiff also alleges that the defendants conspired against him "for the purpose of impeding, hindering, obstructing or defeating the due course of justice" in violation of 42 U.S.C. § 1985(2). Filing No. 49, Second Amended Complaint at 6, ¶ 38. The plaintiff further alleges that the defendants "conspired to deprive Plaintiff of acting lawfully as a witness to an ongoing legal proceeding under which he had certain duties and obligations to produce information and be truthful as to actions pertaining to the legal proceeding." *Id.,* ¶ 40. The "legal proceeding" to which the complaint refers is apparently CCI's state court suit against the University for breach of contract, in which the plaintiff was twice deposed.

With the reference to a "legal proceeding," the plaintiff appears to invoke the first part of section 1985(2), which proscribes conspiracies

> to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully, or to injure such party or witness in his person or property on account of his having so attended or testified.

42 U.S.C. § 1985(2). To prevail, a plaintiff must show that two or more defendants conspired together to injure him for participating in a federal lawsuit. *Carhart v. Smith,* 178 F.Supp.2d 1048, 1065 (D.Neb. 2001) (*citing Gometz v. Culwell,* 850 F.2d

461, 464 (8th Cir.1988); *Rutledge v. Arizona Bd. of Regents,* 859 F.2d 732, 735 (9th Cir.1988); *Wright v. Illinois Dep't of Children & Family Servs.,* 40 F.3d 1492, 1507 (7th Cir.1994)). No class-based animus is required to state a claim under the first part of section 1985(2). *Kush v. Rutledge,* 460 U.S. 719, 726, 103 S.Ct. 1483, 75 L.Ed.2d 413 (1983).

■ The defendants correctly argue that a claim under the first part of section 1985(2) does not apply to state court actions and only protects those who would testify in federal courts.[15] Moreover, the record contains no documentary evidence that a federal proceeding based on the TLA ever took place or, more to the point, that the plaintiff was named as a witness, testified, attended, or was involved in a federal lawsuit concerning the TLA. Thus, the plaintiff is barred from raising a claim under the first clause of section 1985(2).

■ The language in the fifth cause of action alleging that the defendants "acted to conspire for the purpose of impeding, hindering, obstructing or defeating the due course of justice" could also be read as raising a claim under the second part of section 1985(2). That part of the statute creates a claim for relief when

> two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws....

However, a claim for interference in a state judicial proceeding under this section requires the plaintiff to establish a class-based animus. *See Kush v. Rutledge,* 460 U.S. at 725, 103 S.Ct. 1483. As noted in the discussion under the fourth cause of action based on 42 U.S.C. § 1985(3), the plaintiff cannot allege such a class-based animus. Accordingly, the defendants' motion for summary judgment is granted as to any cause of action based on 42 U.S.C. § 1985(3) or (2).

### State Law Causes of Action

In the concluding paragraph of their brief, the defendants argue that the fifth through tenth causes of action should be dismissed because no federal cause of action exists on which to base supplemental jurisdiction. Since this summary judgment order does not extinguish all of the plaintiff's federal claims, such a dismissal would be improper.

THEREFORE, IT IS ORDERED:

1. The defendants' motion for summary judgment, Filing No. 17, is granted in part and denied in part as detailed in this memorandum and order.

2. Plaintiff's first, third, fourth and fifth causes of action are dismissed, and plaintiff's second cause of action, the first amendment issue, and remaining causes of action shall proceed to trial.

3. The defendants' motion, Filing No. 19, for oral argument on the motion for summary judgment is denied.

---

**15.** The plaintiff argues that *Shaw v. Garrison,* 391 F.Supp. 1353 (E.D.La.1975), relied upon by the defendants as support for limiting section 1985(2) to federal court proceedings, was reversed and is therefore inapplicable. The court agrees that the case was reversed, but the reversal concerned rights of survivorship and section 1983 actions—an issue not present in this case. *See Robertson v. Wegmann,* 436 U.S. 584, 98 S.Ct. 1991, 56 L.Ed.2d 554 (1978).